Sanders, et al. v. Wyeth, et al.                     Deposition of                          April 16, 2004
                                                     Mary Sanders

Page 74

1    A.   Yes.
2    Q.   Okay.  Do you understand that, by signing
3   this, you're declaring that this is all truthful
4   information?
5    A.   Yes.
6    Q.   Okay.  As -- and -- let's see.  Could you
7   turn to page 2 for me, please?  Under No. C here,
8   you've checked yes, that -- that you've claimed that
9   you've suffered bodily injury as a result of using
10  Pondimin, Redux, or phentermine.  Do you feel that --
11  do you -- do you remember any of the names of those
12  drugs:  Pondimin, Redux, or phentermine?
13   A.   I definitely -- I remember phentermine.
14   Q.   Phentermine?
15   A.   I really -- I remember that.
16   Q.   And how do you remember that from?
17   A.   I think more -- more just talking to -- me
18  and Brenda just talking about we was taking the pill.
19   Q.   Uh-huh (Indicating yes).
20   A.   I just -- I don't know why I remember
21  phentermine, but I remember, you know, that word.
22   Q.   Okay.  What -- you said you -- you and
23  Brenda are pretty close friends?
24   A.   Yes.
25   Q.   Do you remember any conversations you and

Page 75

1   Brenda had about taking diet drugs?
2    A.   No.  Just we just both experienced, you
3   know, being jittery.
4    Q.   Uh-huh (Indicating yes).  And do you
5   know -- do you know if she ever took diet drugs prior
6   to 1999 when y'all -- when you both took them?
7    A.   I don't know.
8    Q.   Don't know.  Have you ever heard her talk
9   about taking any drug called Redux or Pondimin?
10   A.   Not that -- I don't know.
11   Q.   Okay.  Did y'all -- y'all -- so y'all
12  talked about the way it made you feel.  Did you talk
13  about anything else?  Did she tell you that she ever
14  felt bad when she took it?
15   A.   Yeah.
16   Q.   How did she feel?  Do you remember?
17   A.   Well, we both experienced being jittery and
18  nauseated.
19   Q.   Jittery and nauseated?
20   A.   Yeah.  It's like your outer body is trying
21  to catch up with your inner body.
22   Q.   Uh-huh (Indicating yes).
23   A.   It's like you have to constantly do
24  something to try to catch up with yourself.
25   Q.   So you kind of felt outside of yourself?

Page 76

1    A.   Right.
2    Q.   Okay.  Did she ever tell you that her chest
3   hurt or anything?
4    A.   Yes.
5    Q.   It did.  Did it hurt while she was taking
6   the drugs?
7    A.   I don't know.  I just talked to her lately,
8   and she just always complains about her chest.
9    Q.   Does she have the same problem that you do
10  with the chest tightness?
11   A.   Yes.
12   Q.   Do you know if she has any, like, sharp
13  pains in her chest?
14   A.   Yes.
15   Q.   She does.  Does she have any problems
16  other -- worse than what you have?
17   A.   Yes.
18   Q.   She does.  Do you know what -- what are
19  those problems?
20   A.   Well, her chest, you know, headaches.
21  Basically that.
22   Q.   Okay.  Do you know if any doctor has ever
23  talked to her?
24   A.   No.
25   Q.   No.  Okay.  Let's see.  Now, turn -- get

Page 77

1   you to turn -- I'll have you to turn to page 7 for
2   me, please.  Under MEDICAL BACKGROUND here, under
3   Section V, is that your -- is that your correct
4   height?
5    A.   Yes.
6    Q.   Okay.  And you have down here that -- are
7   you -- is your current weight now 200?
8    A.   Yes.
9    Q.   All right.  And was your weight 150 before
10  you used the diet drugs?
11   A.   Yes.
12   Q.   Okay.  Since you -- since you took these
13  diets drugs -- you said you went and saw Dr. Henson
14  twice; is that correct?
15   A.   Yes.
16   Q.   Did -- does that mean that you took them
17  for just a couple of months, or did you take them for
18  longer than that?
19   A.   Just a couple of months.
20   Q.   Have you taken any diet drugs since then?
21   A.   No.
22   Q.   What made you want to quit taking diet
23  drugs?
24   A.   The way it made me feel --
25   Q.   The way it made you feel?

Sanders, et al. v. Wyeth, et al.                    Deposition of                    April 16, 2004
                                                    Mary Sanders

Page 78

1    A.  -- the time when I took it.
2    Q.  Well, did you have much success when you
3  took them?
4    A.  No.
5    Q.  No.  Did you lose any weight?
6    A.  No.
7    Q.  No.  Okay.  I want to turn your attention
8  to page 9 now.  Under Section -- Section E, it
9  requests whether or not you've been prescribed any
10  medicine -- medications to use to control your
11  weight, and you've checked yes.  And then, under the
12  two pills you have down here, you have Pondimin and
13  phentermine.  And approximate usage, the date is
14  January 1999.  Is January when you went over and saw
15  Dr. Henson?
16    A.  Yes.  I think it was January of '99.
17    Q.  Okay.  Is -- do these two dates and two
18  medicines look -- look accurate to you?
19    A.  Yes.  Phentermine is a definite, but I knew
20  there was two.  And I -- I put Pondimin because I
21  remember that little peach pill.
22    Q.  Uh-huh (Indicating yes).
23    A.  And I really wasn't really sure, was the
24  name of it -- was it Pondimin.
25    Q.  Uh-huh (Indicating yes).

Page 79

1    A.  I -- I wasn't really sure of it.
2    Q.  Okay.
3    A.  I don't know why I put Pondimin, but -- I
4  thought that, you know, might have been the pill.
5  But I remembered the pill.
6    Q.  Okay.
7    A.  And I remember that -- that one color of
8  that pill.
9    Q.  Did anyone ever tell you that Pondimin was
10  a little peach pill?
11    A.  No.  Phentermine could have been the peach
12  pill.
13    Q.  Okay.
14    A.  You know, I remember phentermine.
15  And . . .
16    Q.  Did you fill this out with the help of
17  anyone, this fact sheet?
18    A.  No.
19    Q.  Okay.  Did anyone -- other -- I recognize
20  that Pondimin is written on this page, but do you
21  remember, is there any -- have you ever heard anyone
22  else ever talk about taking Pondimin --
23    A.  No.
24    Q.  -- or used the word "Pondimin"?
25    A.  No.

Page 80

1    Q.  Okay.  All right.
2    A.  No more than I just, you know, look at this
3  paper when you've got Pondimin or Redux or --
4    Q.  Right.
5    A.  -- you know, phentermine.
6    Q.  Is -- is it possible that you never took
7  Pondimin, that you took something else?
8    A.  Well, I know I took two pills.
9    Q.  Okay.
10    A.  So --
11    Q.  All right.
12    A.  And then, you know, I look at them three.
13  I know it's -- it had to be one of them three.  But I
14  know it was two pills that I -- I took.
15    Q.  Okay.
16    A.  And phentermine, I remembered that name.
17    Q.  Right.  Okay.  On -- if you'll turn to --
18  turn to the next page, page 10.  Are you -- do you --
19  do you ever drink alcohol, Ms. Sanders?
20    A.  Like once, maybe twice a month.
21    Q.  Once or twice a month.  Like -- do you
22  drink a lot when you drink or just a little?
23    A.  No.  Just one cooler.
24    Q.  One cooler.  Have you ever -- have you ever
25  smoked cigarettes?

Page 81

1    A.  No.
2    Q.  Have you ever done any illegal drugs?
3    A.  No.
4    Q.  No.  Okay.  If you'll look at -- on page
5  10, on No. H here, it says, "To the best of your
6  knowledge, have you ever experienced any of the
7  following?"  And you've checked yes by all of these
8  categories except memory loss.  And I'll just read
9  through some of the categories:  Shortness of breath
10  not associated with vigorous exercise; persistent or
11  recurrent pain in your chest; irregular heartbeat,
12  palpitations; abnormal lack of energy; fainting,
13  dizziness, lightheaded; snoring; head pounding; sleep
14  apnea; swelling; and arthritis or joint pain.  Is
15  that this pretty accurate?  You -- you have
16  experienced all of those things?
17    A.  Yes.
18    Q.  Do any of those stand out above the rest as
19  far as problems that -- that you had?
20    A.  Say it again.
21    Q.  Have any -- I'm sorry.  Are any of these
22  more severe than the others?  Like, are the headaches
23  worse than the lack of energy or --
24    A.  Lack of energy and headaches.
25    Q.  Okay.

Sanders, et al. v. Wyeth, et al.                Deposition of                    April 16, 2004
                                                Mary Sanders

Page 82

1    A. I'm sorry.
2    Q. What -- what about faintning -- fainting?
3 Have you ever fainted?
4    A. No. I always get -- I get lightheaded.
5    Q. Get lightheaded? Do you get lightheaded
6 on -- just -- do you do anything specifically when
7 you get lightheaded?
8    A. No. Only -- like, when I get tired,
9 shortness of breath, then I get lightheaded.
10    Q. Okay. Has any doctor ever told you that
11 you have sleep apnea?
12    A. No.
13    Q. Have you ever woken up in the middle of the
14 night and felt you couldn't breathe?
15    A. Yes.
16    Q. Does that happen quite a bit?
17    A. I won't say quite a bit. It's probably
18 like every now and then.
19    Q. Okay.
20    A. I won't just say --
21    Q. What -- what happens? Do you feel like
22 you're choking, or do you just wake up and you're
23 panting?
24    A. And like -- yes. And I just cannot
25 breathe, and chest hurts. That's it.

Page 83

1    Q. Are you -- how -- how long does that spell
2 last?
3    A. Maybe like a couple of seconds.
4    Q. Okay. Now, you've checked, under No. 3
5 here, irregular heartbeat, palpitations, tachycardia,
6 or bradycardia. When you checked yes to that, which
7 one of those four were you checking yes to?
8    A. Irregular heartbeat.
9    Q. Irregular heartbeat. And has a doctor told
10 you, you have irregular heartbeat?
11    A. No. I just -- I gathered it from myself,
12 the way I'll be feeling.
13    Q. Do you ever -- can you ever feel your heart
14 beating, like pounding in your chest?
15    A. Only when it gets tight.
16    Q. Only when it gets tight. Does -- does
17 it -- does it feel like it's not beating correctly?
18    A. Yes.
19    Q. Okay. Other than the echocardiogram you
20 had done, which, you have the report there, have you
21 ever had an echo -- any other echocardiograms done?
22    A. No.
23    Q. Okay.
24    A. Is EKG the same as a echo?
25    Q. No. Different test.

Page 84

1    A. Okay.
2    Q. EKG should -- did you -- did you see a
3 little slip with the EKG, kind of -- has your heart
4 rate printed on it?
5    A. Yes.
6    Q. Okay. It's a -- it's -- echo is a
7 different test. On page -- if you could, turn your
8 attention to page 17. It actually starts at the end
9 of page 16, under S. It asks you to a -- to complete
10 the chart that's on the next page, and you've checked
11 mild under all four categories listed there for valve
12 regurgitation?
13    A. Yes.
14    Q. Where did -- did you fill that out?
15    A. Yes.
16    Q. Do you -- where did you get the information
17 from that led you to fill that out?
18    A. Just looking at the sheet that I had.
19    Q. Looking at the echocardiogram report?
20    A. Yes.
21    Q. Okay. And down here, also, on 17, there's
22 a -- in this box here under DIET DRUG USE, under both
23 Pondimin and phentermine, you've listed, also, once
24 again, 1-9 -- 1 -- January 1999. And that
25 information is the same as it was on the other page,

Page 85

1 isn't it?
2    A. Yes.
3    Q. Okay. And Dr. Henson prescribed those for
4 you?
5    A. Yes.
6    Q. All right. Okay. Is that where you got
7 the -- that orange round pill there, is that where
8 you got the idea of Pondimin?
9    A. I think so, yes. I think so, yeah.
10    Q. Okay. Just -- I don't know. I can't --
11 I'm sorry if I'm asking this for a second time, but
12 what is your current weight right now, Ms. Sanders?
13    A. Two -- about 200.
14    Q. About 200. Okay. On -- I turn your
15 attention to page 22. You've listed your income
16 earnings for the past five years -- or for at
17 least -- from 1997 through 2001?
18    A. Uh-huh (Indicating yes).
19    Q. Are those -- are those income numbers
20 pretty accurate?
21    A. Basically, I was just guessing --
22    Q. You were guessing?
23    A. -- this number.
24    Q. Is that based at all on any information
25 that you had, any tax returns or anything?

Sanders, et al. v. Wyeth, et al.                    Deposition of                                   April 16, 2004
                                                 Mary Sanders

Page 86

1    A.  Well, first, by being a beautician, you're
2  self employed.
3    Q.  Uh-huh (Indicating yes).
4    A.  You know, you're allowed five years, you
5  know, for you -- to do your taxes.
6    Q.  Uh-huh (Indicating yes).
7    A.  And I basically just started doing my taxes
8  this year --
9    Q.  Okay.
10   A.  -- and last year.  So --
11   Q.  So this is just kind of an estimate of how
12  much you made?
13   A.  Yes.
14   Q.  All right.  This -- what -- what would you
15  say your income has been from -- in 2002 and 2003, if
16  you can just take a guess?
17   A.  I'd say about --
18   Q.  Well, what did you file for, actually?
19   A.  For 6,000.
20   Q.  6,000?
21   A.  Yeah.  Because I was just working weekends.
22   Q.  Uh-huh (Indicating yes).
23   A.  You know, my husband is the bread winner,
24  so --
25   Q.  All right.  Okay.  Is this -- now, is the

Page 87

1  income here representative of your combined incomes
2  or just yours?
3    A.  Just mine.
4    Q.  Okay.
5    A.  I think I was -- I was just guessing them,
6  you know, guessing.
7    Q.  Right.  Okay.  On -- I turn your attention
8  to page 2 -- oh, I'm sorry.  Yeah.  Keep going.  I'm
9  sorry.  It's -- it's probably more like page 26?
10         MS. TOLLE:  Just a second page 2.
11   Q.  (By Mr. Blount)  Yeah.  It would
12  technically be page 26, but it's listed as page 2 on
13  this handout.  You have a -- this is listing -- a
14  listing of primary care physicians you've seen under
15  Category B.  At the top of page 2 here, you have Dr.
16  Edmond Henson.  Is that the same physician that
17  prescribed you the diet drugs?
18   A.  Yes.
19   Q.  Okay.  And his address here is listed as
20  North Jefferson, Macon, Mississippi.  Is that
21  correct?
22   A.  No.
23   Q.  That's not correct?
24   A.  No.  Gordo, Alabama.
25   Q.  It's in Gordo.  Did -- did you fill this

Page 88

1  out?  Do you remember filling this part of the --
2    A.  Yes.
3    Q.  If you turn back one page, you can see the
4  front.  You can see what -- what -- I guess this is a
5  separate form that's attached here.  Do you -- do you
6  remember filling this out?
7    A.  Yes.
8    Q.  Is there a -- does it -- it appears that
9  the address for Dr. Henson is the same as the Macon
10  Primary Care physician.  Is that just a mistake you
11  made?
12   A.  That's a mistake.
13   Q.  Okay.  Do you remember Dr. Henson's address
14  in Gordo?
15   A.  No.  I just remember Gordo, Alabama.
16   Q.  Okay.  All right.  And then, on -- on page
17  E -- oh, I'm sorry -- page 4, No. E.  Keep going.
18  Under health care facilities or hospitals you've
19  received outpatient treatment on, under E, you listed
20  Starkville hospital, Baptist hospital, and Noxubee
21  General.  Do you remember -- now, we talked about you
22  going to -- to Baptist hospital?
23   A.  Right.
24   Q.  Do you remember any kind of emergency room
25  visit or outpatient treatment you would have had at

Page 89

1  Starkville hospital?
2    A.  No.
3    Q.  No.  Okay.  Is there any reason why you
4  listed that under here, then?
5    A.  Starkville, you know, that's when I had my
6  baby.  You know, it just asked about hospitals and
7  health care places.
8    Q.  Okay.  All right.
9    A.  That's why I wrote that down.
10   Q.  And then, why -- why did you put that
11  Noxubee General, then?  Did you -- did you ever go
12  there?
13   A.  Yes.  I have been there before.
14   Q.  Okay.
15   A.  I don't remember what it was for, but I --
16  I have been there before.  I just, you know, put them
17  down since it asked.
18   Q.  Okay.  Do you remember if were you sick or
19  hurt when you went there?
20   A.  I was sick.
21   Q.  You were sick.  Do you remember if it had
22  anything to do with your heart hurting?
23   A.  I don't remember.
24   Q.  Do you remember if you had to spend the
25  night?

Page 90

1   A.  No.
2   Q.  Okay.  It was just an ER visit?
3   A.  Yes.
4   Q.  Do you remember if you were terribly sick
5   or just had the flu?
6   A.  I didn't have the flu.  I don't -- I don't
7   remember.  I know it wasn't the flu.
8   Q.  Okay.  All right.  Can you remember about
9   when you would have gone to Noxubee?  Would it have
10  been --
11  A.  I don't remember.
12  Q.  -- 10 years ago or five years ago?
13  A.  (No response).
14  Q.  Can't remember?
15  A.  I don't remember.
16  Q.  Okay.  All right.  On page 7, if you'll
17  just keep going, under Category G, you were asked to
18  list drug stores that you've used in the past 10
19  years, and you listed B & O Drugs.  And then, we
20  talked about this earlier.  Can you remember any of
21  the prescriptions you would have had filled there?
22  A.  No.
23  Q.  No.  You've also listed Wal-Mart here.  Did
24  you get any prescriptions filled at the Wal-Mart in
25  Macon?

Page 91

1   A.  No.  We don't have a Wal-Mart in Macon.
2   Q.  Uh-huh (Indicating yes).
3   A.  I probably just got tired of filling this
4   out.  But I only went to B & O and Kmart.
5   Q.  Okay.  So you didn't go to Wal-Mart?
6   A.  No.
7   Q.  You never got a prescription filled at
8   Wal-Mart?
9   A.  I don't even know why I wrote that, because
10  Wal-Mart is not in Macon.
11  Q.  Okay.  Did you ever get a prescription
12  filled at a Wal-Mart in another city?
13  A.  No.
14  Q.  Okay.  So you've never had a prescription
15  filled at Wal-Mart?
16  A.  No.
17  Q.  Okay.  So City Drugs is also listed here on
18  page 8?
19  A.  Uh-huh (Indicating yes).
20  Q.  Have you ever had a prescription filled at
21  City Drugs?
22  A.  Yes.
23  Q.  You have.  Is that -- and that's in Macon?
24  A.  Yes, that's in Macon.
25  Q.  Okay.  Do you remember what you had filled

Page 92

1   there?
2   A.  No.
3   Q.  Do you know if it was diet drugs?
4   A.  I don't think so.
5   Q.  Don't think so?
6   A.  No.
7   Q.  Do you remember what doctor may have
8   prescribed those -- prescribed that medicine for you?
9   A.  Beverly Gardner or either Denzil Robertson.
10  You know, if I went there, it was one of them.
11  Q.  Okay.  And you don't -- wouldn't remember
12  what they -- would it have been any kind of heart
13  medicine they gave you?
14  A.  I don't think so.  I don't remember.
15  Q.  Okay.  And then, you've got Kmart Pharmacy
16  in Mobile, Alabama.  That's where you had your diet
17  drugs prescribed?
18  A.  Yes.
19  Q.  Can you remember any other type of medicine
20  you would have had filled there?
21  A.  No.
22  Q.  No.  Okay.  Do you remember any other
23  pharmacies you may have gone to in Macon or --
24  A.  No.
25  Q.  -- Columbus?

Page 93

1   A.  Those are the only two.
2   Q.  Okay.  If you could, turn to the last two
3   pages of the fact sheet.  The first page here is from
4   B & O Pharmacy.  Did you -- are these -- have you
5   ever seen this before, this page?
6   A.  No.
7   Q.  Did you -- do you remember maybe --
8   MR. BLOUNT:  I'm sorry.  Do you want a
9   copy of this?
10  MS. TOLLE:  Do you have a copy,
11  please?
12  MR. BLOUNT:  Yeah, I do.  I should.
13  (After a discussion off the record,
14  the deposition continued as follows:)
15  Q.  (By Mr. Blount)  So are you -- this is what
16  appears to be -- it's got B & O Pharmacy written up
17  in the left-hand corner.
18  A.  Okay.
19  Q.  And it says, "PATIENT PRESCRIPTION SUMMARY"
20  in the middle.  Is that your name listed right there
21  above -- on the second paragraph?
22  A.  Yes.
23  Q.  What is that -- is that -- it says, "Mary
24  Mason Sanders, Route 1, Box 224, Macon, Mississippi"?
25  A.  Yes.

Sanders, et al. v. Wyeth, et al.                    Deposition of                         April 16, 2004
                                                    Mary Sanders

Page 94

1    Q.   Is that an address you've lived at?
2    A.   Yes.
3    Q.   Okay.  Is that -- would you have been
4    living there in and around 1998, 1999?
5    A.   Yes.
6    Q.   Okay.  Is that your correct phone number
7    that you had at that address?
8    A.   Yes.  Then, yes.
9    Q.   Is it -- but it's not your correct phone
10   number now, though?
11   A.   No.
12   Q.   Okay.
13   A.   Not the correct address now.
14   Q.   Okay.  Is that -- now, is that the same
15   place that you -- is that the same house; they just
16   changed the address?
17   A.   Well, I was staying with my mom --
18   Q.   Okay.
19   A.   -- at the time.
20   Q.   That's your mother's address?
21   A.   Right.
22   Q.   Okay.  I knew the date --
23   A.   Well, I wasn't staying at my mom's.  I
24   think I just -- by me filling my prescriptions out, I
25   never changed my address.

Page 95

1    Q.   Okay.  All right.
2    A.   Even now it's probably still the same.  I
3    don't know.
4    Q.   Okay.  Down here, listed on this summary,
5    is acetaminophen -- acetaminophen, hydrocodone, and
6    what appears to be Remeron is what it looks like to
7    me.  Do you remember being prescribed any of these
8    drugs?
9    A.   Dr. Pearson -- you know, in '98, that's
10   when -- after I had my baby.
11   Q.   That's when you had your baby?
12   A.   Yes.
13   Q.   So he gave you -- okay.  And so that's
14   your -- that's your --
15   A.   Uh-huh (Indicating yes).
16   Q.   -- OBGYN?
17   A.   In '98, that's when I got a tooth pulled.
18   That's my dentist.
19   Q.   Okay.  Dr. Wiygul; is that right?
20   A.   Right.  And Dr. Robertson, this is when he
21   prescribed me that medicine.
22   Q.   Okay.  So he --
23   A.   I wasn't sure what it was.
24   Q.   He -- and he prescribed you this
25   for your -- for your heart?

Page 96

1    A.   Yes.  This is the time.  I remember that
2    amount.
3    Q.   Okay.  It says -- says quantity of 30.
4    Does that -- does that look about right?
5    A.   Yes.
6    Q.   Did you take all 30 of those pills?
7    A.   Yes.
8    Q.   Did you take -- did he ever give you
9    another prescription after that?
10   A.   No.  I never went back.
11   Q.   Never went back.  Okay.  When you took
12   those pills, did they help -- did they help your --
13   help your heart?  Did the tightness go away?
14   A.   I don't remember.
15   Q.   Don't remember.  Okay.  All right.  Do you
16   remember -- can you think -- can you remember any
17   other types of medicine you may have ever had
18   prescribed or that you would have bought at B & O
19   Pharmacy?
20   A.   No.
21   Q.   No?
22   A.   No.
23   Q.   So -- and do you -- you can't remember
24   any -- any diet drugs you would have maybe gotten
25   there?

Page 97

1    A.   I didn't get any diet drugs there.
2    Q.   Okay.  You can, then, turn to the next page
3    for me.  Up at the top -- this is -- says, "MEDICAL
4    EXPENSES, 01/01/1999 through 08/22/2002."  And it's
5    got "KMART PHARMACY" with a Mobile, Alabama, address.
6    Do you remember being -- going to Mobile, Alabama,
7    and getting the diet drugs -- or getting drugs there
8    at their pharmacy?
9    A.   Yes.
10   Q.   Okay.  Now, the drugs they have listed here
11   are phentermine, 30 milligrams, and what appears to
12   be potassium chloride, 10 milligrams.  I can't really
13   read it very well, but do you -- do you see those
14   words on that page?
15   A.   Yes.
16   Q.   Okay.  And this is prescribed by Dr.
17   Henson; is that correct?
18   A.   Yes.
19   Q.   Okay.  Do you remember getting those --
20   those medicines?
21   A.   Yes.
22   Q.   Okay.  Does this -- does this appear to
23   be -- do those -- let's see.  The -- the
24   phentermine -- I can't read this very well.  Okay.
25   I'm sorry.  Down here at the bottom, right before

Sanders, et al. v. Wyeth, et al.                    Deposition of                                        April 16, 2004
                                                   Mary Sanders

Page 98

1  the -- the signature of the pharmacist, it says,
2  "TAKE ONE TABLET BY MOUTH EVERY DAY FOR 30 DAYS."
3  And the one up above it, underneath the phentermine,
4  says, "TAKE ONE CAPSULE BY MOUTH EVERY DAY FOR 21
5  DAYS."
6      A.  Okay.
7      Q.  Do you recall doing that, taking the
8  pills --
9      A.  Yes.
10     Q.  -- as those -- as those instructions.
11 Okay.  And do you remember -- is this -- is this the
12 only prescription you would have had filled at that
13 pharmacy, or did you get a second prescription filled
14 there?
15     A.  I -- I don't remember.  I remember just
16 filling this prescription in.
17     Q.  Okay.  And you saw Dr. Henson at least
18 twice; is that correct?
19     A.  Yes.  I -- if I'm not mistaken, I think it
20 was twice.
21     Q.  Okay.  Do you remember if you had
22 prescriptions filled both times you went to see him?
23     A.  I don't remember.
24     Q.  Don't remember.  Okay.  Just for
25 clarification, do you -- do you see where Pondimin

Page 99

1  has been prescribed on either this page or on the
2  previous page?
3      A.  No.  No.  Like I said, I remember
4  phentermine.
5      Q.  Okay.
6      A.  And, you know, just by you giving me those
7  three options, you know, while I was filling out this
8  paper (indicating).
9      Q.  Right.
10     A.  So I just, you know, thought maybe it was
11 Pondimin.
12     Q.  Okay.
13         MS. TOLLE:  Do you have an original?
14 I'm just looking --
15         MR. BLOUNT:  I think this is my
16 original.
17         MS. TOLLE:  Because the last line, it
18 looks like there's something under there that you
19 cannot read.  I don't know what it is.
20         MR. BLOUNT:  This is the copy that was
21 sent to me.  The lines appear to --
22         MS. TOLLE:  Okay.
23         MR. BLOUNT:  -- go up and down the
24 page, but --
25         MS. TOLLE:  I just didn't know if

Page 100

1  there was any difference on --
2      Q.  (By Mr. Blount)  So have you ever -- have
3  you ever talked to anybody about taking Pondimin?  Do
4  you ever remember --
5      A.  No.
6      Q.  -- anyone ever talking to you about it.
7  Have you ever heard anyone talk about fen-phen?
8      A.  No.
9      Q.  No.  Have you ever heard anyone talk about
10 any diet drugs, maybe a couple of years before you
11 took them, being pulled from the market?
12     A.  No.
13     Q.  Okay.  So have you ever heard anyone say
14 that Pondimin was pulled from the market in 1997?
15     A.  No.
16     Q.  No.  Or 1998, any of those years?
17     A.  No.
18     Q.  No, 1998.  Okay.  To the best of your
19 knowledge, do you know -- do you know -- do you know
20 if fen-phen -- the drug fen-phen was pulled from the
21 market?
22     A.  Not that I know of.  No.  Not that I know
23 of.  I don't -- I don't know.
24     Q.  Okay.  Are you -- as we sit here today, do
25 you think you took -- the -- the drug Pondimin?

Page 101

1      A.  Well, I know it was just two pills.  And
2  you -- there were three options you gave me.  So I
3  just took a educated guess that it might have been
4  Pondimin.  I don't really remember -- I don't know
5  what he prescribed them.  I took them in hopes of
6  losing weight --
7      Q.  Okay.  All right.
8      A.  -- to be honest.
9      Q.  All right.
10     A.  And they were just asking what pill is
11 this, what pill is that.
12     Q.  Okay.
13         MR. BLOUNT:  Can we take a recess?
14         MS. TOLLE: Yes.
15         MR. BLOUNT:  All right.
16         MR. FORD:  We're off the record.  The
17 time is 11:40 a.m.
18         (After a recess, the deposition
19 continued as follows:)
20         MR. FORD:  We're back on the record.
21 The time is 11:46 a.m.
22     Q.  (By Mr. Blount)  Okay, Ms. Sanders.  You
23 said that you saw Ms. -- Dr. Gardner in the last few
24 months; is that correct?
25     A.  Dr. Gardner?  Yes.

Sanders, et al. v. Wyeth, et al.                    Deposition of                         April 16, 2004
                                                    Mary Sanders

Page 102

1    Q.  Okay.  Can you -- can you remember any
2    other doctors you might have seen in the last 12
3    months?
4    A.  No.
5    Q.  Have you been to any health care facility,
6    emergency room, or minor clinics in -- in the last 12
7    months?
8    A.  No.
9    Q.  No.  Okay.  And now, you did mention a
10   dentist earlier.  Who is your dentist right now?
11   A.  Same doctor.
12   Q.  Same doctor?
13   A.  James Wiygul.
14   Q.  Wiygul is his last name?
15   A.  Uh-huh (Indicating yes).  Wiygul.
16   Q.  Wiygul.  Do you remember where his office
17   is?
18   A.  In Columbus, Mississippi.
19   Q.  Do you remember possibly where, what
20   street?
21   A.  No.
22   Q.  Do you know if he's got a -- what the name
23   of his office is?  Is it Dr. Wiygul's office?  I
24   mean -- what I mean is, does it -- does it have -- is
25   he part of a group, a medical group?

Page 103

1    A.  Well, his father's practice.
2    Q.  Okay.
3    A.  And I think it's -- if I'm not mistaken, I
4    think it's just his last name --
5    Q.  Okay.
6    A.  -- you know, on the door.
7    Q.  All right.  And how long have you been
8    seeing Dr. Wiygul?
9    A.  Since '98.
10   Q.  Since 1998.  All right.  Who did you see --
11   did you see a dentist before him?
12   A.  No.
13   Q.  Okay.
14   A.  Well, yes.
15   Q.  You did?
16   A.  Dr. Atkins in Macon, Mississippi.
17   Q.  What did you see Dr. Atkins for, just for
18   general cleanings?
19   A.  Yes.
20   Q.  Did you ever see Dr. Atkins for braces or
21   anything?
22   A.  No.
23   Q.  Okay.  Did you ever -- did -- now, with Dr.
24   Wiygul, have you only gone for cleanings, or have you
25   had any major work done?

Page 104

1    A.  Tooth pulled.
2    Q.  You've had teeth pulled.  When you go to
3    the dentist, does -- have they ever -- have they ever
4    told you, you need to take antibiotics before you get
5    your teeth cleaned?
6    A.  No.
7    Q.  No.  Okay.  Have you ever seen a sign
8    hanging in the dentist's office that says, if you
9    ever took diet drugs, to make sure you get an
10   antibiotic or make sure you tell them?
11   A.  No.
12   Q.  No.  Okay.  Well, before Dr. -- before Dr.
13   Robertson and -- I believe -- I believe you said you
14   saw -- I believe -- well, the pharmacy records show
15   1998, I believe.  If you could look at those again.
16   It's the second to last page on Exhibit -- on --
17   on -- on this fact sheet.  It says Dr. Denzil
18   Robertson.  And the date for that -- I'm sorry -- is
19   1999?
20   A.  Yeah.
21   Q.  Is that -- is that -- is that accurate,
22   that 3-02-99?  Is that about the time you would have
23   seen him?
24   A.  I don't remember.
25   Q.  Don't remember.  Can you remember any other

Page 105

1    physician you've seen prior to seeing Dr. Robertson,
2    other than your OBGYN doctor, since you've been a --
3    since you've been a teenager, since you moved here?
4    A.  No.
5    Q.  No.  Okay.  And that prescription for
6    Remeron that Dr. Robertson prescribed to you, you
7    only took that one prescription; is that correct?
8    A.  Yes.
9    Q.  Do you -- do you remember why you decided
10   not to take any more?
11   A.  I just didn't have the money to keep making
12   that doctor's visit.
13   Q.  Okay.  And he only gave you a prescription
14   for one -- one-time prescription?
15   A.  Yes.
16   Q.  Okay.  Have you ever taken any medicine for
17   anxiety?
18   A.  No.
19   Q.  Have you ever taken any medicine for
20   depression?
21   A.  No.
22   Q.  Okay.  Have you ever -- have you ever felt
23   that you might be depressed?
24   A.  No.
25   Q.  Okay.  Good.  I'm going to go through a

Sanders, et al. v. Wyeth, et al.                Deposition of                              April 16, 2004
                                                 Mary Sanders

Page 106

1   list of tests here.  I just want you to tell me
2   whether or not you know if you've had that test?
3       A.  Okay.
4       Q.  An electrocardiogram?
5       A.  I don't know.
6       Q.  Okay.  Chest X-ray?
7       A.  Yes.
8       Q.  Is that when you were in the hospital in --
9       A.  Baptist Memorial.
10      Q.  -- Baptist Memorial?
11      A.  Yes.
12      Q.  Have you ever had a chest X-ray other than
13  that?
14      A.  Not that I can remember.
15      Q.  Okay.  Has anyone ever given you what's
16  called an exercise test or stress test?
17      A.  No.
18      Q.  Put you on a treadmill with little leads or
19  anything?
20      A.  No.
21      Q.  No.  Okay.  Have you ever heard doctors
22  tell you that they're giving you a pulmonary function
23  test or a test on your heart -- I mean test on your
24  lungs?
25      A.  No.

Page 107

1       Q.  Okay.  Have you ever heard any -- any --
2   any physician ever tell you they're testing your
3   lungs for anything?
4       A.  No.
5       Q.  Okay.  When you went to see -- when you
6   went to Columbus and went to the Landmark Hotel and
7   Dr. Tai did the echocardiogram, do you remember if
8   you were having any chest problems that day, or had
9   you been having any recently?
10      A.  Well, I -- I had some recently.
11      Q.  You had -- you'd had some prior --
12      A.  I probably was that day.  I don't remember.
13      Q.  Okay.
14      A.  I don't remember.
15      Q.  All right.  And you've never discussed that
16  echocardiogram with any other doctors; is that --
17      A.  No.
18      Q.  Do you remember if Dr. Tai told you he
19  wanted to see you again, wanted a follow-up visit?
20      A.  Who is that?
21      Q.  I'm sorry.  The -- the -- the person that
22  gave the echocardiogram in Columbus, that doctor.
23  Did he tell you he wanted --
24      A.  Oh.  No.
25      Q.  -- to see you again?

Page 108

1       A.  I don't remember.
2       Q.  Okay.
3       A.  I don't recall.
4       Q.  Okay.  Do you know if you have any
5   appointment scheduled in the future to have an
6   echocardiogram done?
7       A.  No.
8       Q.  No.  Okay.  Do you have any appointment
9   scheduled in the future to see a doctor?
10      A.  Only when I need to.
11      Q.  Only when you need to.  Have you ever
12  smoked?
13      A.  No.
14      Q.  Okay.  I need to go -- we need to go over
15  some family medical history with you.  Are your
16  parents both still alive?
17      A.  Yes.
18      Q.  They are.  Are they -- what your mom's
19  name?
20      A.  Edna Mason, E-D-N-A.
21      Q.  Okay.  And where does she live?
22      A.  Macon, Mississippi.
23      Q.  Are y'all pretty close?
24      A.  Yes.
25      Q.  See each other quite a bit?

Page 109

1       A.  Every day.
2       Q.  Every day.  Does she know that you're
3   involved in this litigation?
4       A.  Yes.
5       Q.  Okay.  Have you ever talked to her about
6   it?
7       A.  No.
8       Q.  Okay.  Does she know you're here doing a
9   deposition today?
10      A.  Yes.
11      Q.  Does she know that you took diet drugs?
12      A.  Yes.
13      Q.  Does she know when you were taking them,
14  that you took -- that you were on them?
15      A.  Yes.
16      Q.  Okay.  Did she -- does your -- did your
17  mother ever take diet drugs?
18      A.  No.
19      Q.  No.  Okay.  Okay.  Is your mom in pretty
20  good health?
21      A.  Yes.
22      Q.  Do you know of any health problems she has,
23  any serious health problems?
24      A.  Well, about a year ago, she found out she
25  was a diabetic.

Sanders, et al. v. Wyeth, et al.                    Deposition of                         April 16, 2004
                                                     Mary Sanders

Page 110

1    Q.   Diabetic.  Do you know if she's ever had
2    any kind of complications, like a stroke or anything,
3    from her diabetes?
4    A.   No.
5    Q.   Do you know if she has any -- has high
6    blood pressure or maybe high cholesterol or anything?
7    A.   No.
8    Q.   Do you know if she has any kidney problems?
9    A.   No.
10   Q.   No.  Okay.  Any other problems she has
11   except diabetes?
12   A.   No.  That's it.
13   Q.   Okay.  Are they just -- do you know if the
14   diabetes are -- excuse me -- real bad, or if
15   they're --
16   A.   Well, they're not bad.  She's never been
17   hospitalized for them --
18   Q.   Okay.
19   A.   -- or anything like that.
20   Q.   About how old is your mom?
21   A.   Fifty-five.
22   Q.   Fifty-five.  Okay.  And your father is
23   still -- still with us?
24   A.   Yes.
25   Q.   What's his name?

Page 111

1    A.   Ezell Mason.
2    Q.   Does he also live in Macon?
3    A.   Yes.
4    Q.   Does he have any -- Mr. Mason have any
5    heart problems -- or, I'm sorry -- health problems?
6    A.   He just found out a couple of months ago
7    that he's a diabetic.
8    Q.   He's a diabetic.  Have you ever been tested
9    for diabetes?
10   A.   No.
11   Q.   No.  Okay.  How old is your father?
12   A.   He's 53.
13   Q.   Fifty-three.  Trust me, if you ask me about
14   my parents, I wouldn't get it either.  Now, does
15   Mr. Mason have any other problems?  Does he have any
16   high blood pressure?
17   A.   No.
18   Q.   Heart -- are there any heart problems or
19   lung problems?
20   A.   No.
21   Q.   Have either of your parents ever had
22   cancer?
23   A.   No.
24   Q.   Okay.  Other than diabetes, neither one of
25   them have any other problems?

Page 112

1    A.   No.
2    Q.   Okay.  Do you have any brothers?
3    A.   Yes.
4    Q.   What are your brothers' names?
5    A.   Anthony Brown.
6    Q.   Brown is his last name?
7    A.   Yes.
8    Q.   Okay.  And it's just -- just one brother?
9    A.   Well, I have a half brother.
10   Q.   Who's your -- what's your half brother's
11   name?
12   A.   Will -- William Macon.
13   Q.   Okay.  And where does Anthony live?
14   A.   Macon, Mississippi.
15   Q.   Does Anthony have any health problems?
16   A.   I think he has high blood pressure.
17   Q.   How old is Anthony?
18   A.   Thirty-two.
19   Q.   Thirty-two.  And where does Will Macon
20   live?
21   A.   Macon, Mississippi.
22   Q.   And do you know if he has any health
23   problems?
24   A.   No.  He's fine.
25   Q.   Okay.  How old is he?

Page 113

1    A.   Thirty-two.
2    Q.   Thirty-two.  All right.  Are you close with
3    either Anthony or Will?
4    A.   Yes.
5    Q.   Close to both of them?
6    A.   Yes.
7    Q.   Do y'all see each other quite a bit?
8    A.   Every day.
9    Q.   Every day.  That's pretty good.  Do they
10   know you're involved in this litigation?
11   A.   No.
12   Q.   No.  Okay.  What about your father?
13   A.   Yes.
14   Q.   He does know that you're involved in the
15   litigation?
16   A.   Yes.
17   Q.   Okay.
18           (After a discussion off the record,
19   the deposition continued as follows:)
20   Q.   (By Mr. Blount)  Do either -- do either of
21   your children have any health problems?
22   A.   No.
23   Q.   No.  They're good, healthy kids?
24   A.   Yes.
25   Q.   Are they -- are they good?

Sanders, et al. v. Wyeth, et al.                  Deposition of                        April 16, 2004
                                                 Mary Sanders

Page 114

1   A.  Yeah.
2   Q.  All right.  Are your grandparents still
3   with us?
4   A.  No.
5   Q.  No.  All -- both sides are passed away?
6   A.  Yes.
7   Q.  Do you -- do you remember what your mom's
8   parents might have passed away from?
9   A.  If I'm not mistaken, the two of them died
10  of natural causes.
11  Q.  They both died of natural causes?
12  A.  Yeah.
13  Q.  Were they -- were they quite old?
14  A.  Yeah.  Yes, they were.
15  Q.  All right.  Do you remember if -- do you
16  remember if either -- anybody ever talking about them
17  having health problems, having -- Granddad had high
18  blood pressure or --
19  A.  No.
20  Q.  -- Grandma had a stroke or anything?
21  A.  No.
22  Q.  No.  Do -- do you know of any health
23  problems that run on her side of the family, that a
24  lot of cousins may have?
25  A.  No.

Page 115

1   Q.  No.  What about your -- what about your
2   father's parents?
3   A.  Grandfather died of cancer, and I think
4   Grandmother died of natural causes, also.
5   Q.  Natural causes.  Do you remember what kind
6   of cancer he had?
7   A.  I don't remember.
8   Q.  Don't remember.
9   A.  Unh-unh (Indicating no).
10  Q.  Do you know of any -- any -- any type
11  illnesses, like seizures or lupus or anything like
12  that, that runs through your --
13  A.  No.  The other side.
14  Q.  Dad's side of the family?
15  A.  No.
16  Q.  No.  Okay.  Do you know if anybody in your
17  family has any kidney problems?
18  A.  No.
19  Q.  No.  Do you have any aunts or uncles that
20  are -- that -- that get sick or have any problems,
21  any health problems?
22  A.  No.
23  Q.  No.  Any -- do you have any cousins that
24  are -- that have health problems?
25  A.  I have a cousin that has lupus.

Page 116

1   Q.  Has lupus.  Is this a first cousin?
2   A.  First cousin.
3   Q.  First cousin.  Is this on your mom or dad's
4   side?
5   A.  Mom.
6   Q.  Mom.  Okay.  Is she -- is she able to keep
7   it under control?
8   A.  Well, she's been sick -- yeah -- well,
9   she's in and out.
10  Q.  In and out.  Okay.  Anybody else have
11  diabetes besides your parents?
12  A.  Sister.
13  Q.  Your sister has diabetes?
14  A.  Yeah.
15  Q.  That's right.  Sister.  Thanks for
16  reminding me.  What's your sister's name?
17  A.  Tonya Lewis.
18  Q.  And you have more than one sister, don't
19  you?
20  A.  Yes.
21  Q.  Okay.  Your sister Tonya has diabetes.  How
22  old is she?
23  A.  She's 29.
24  Q.  Twenty-nine.  Does she have -- take insulin
25  shots, or does she take pills?

Page 117

1   A.  Pills.
2   Q.  Pills.  Do either of your parents take
3   shots?
4   A.  Pills.
5   Q.  They both take pills?
6   A.  Uh-huh (Indicating yes).
7   Q.  Okay.  How long has -- how long has she
8   known she has diabetes?
9   A.  I'd say probably about two years.
10  Q.  Two years.  So she didn't have it when she
11  was a child or anything?
12  A.  No.
13  Q.  Okay.  Do you have any nieces or nephews
14  that have diabetes?
15  A.  No.
16  Q.  Okay.  Is that your only other relative
17  that has diabetes?
18  A.  That's the only one.
19  Q.  Okay.  Now, do you have -- do you have any
20  more sisters?
21  A.  Thelma Mason.
22  Q.  Thelma -- spell it on the record?
23  A.  Thelma, T-H-E-L-M-A.
24  Q.  Okay.  And she also took -- took diet drugs
25  with you, correct?

Sanders, et al. v. Wyeth, et al.    Deposition of      April 16, 2004
           Mary Sanders

Page 118

1 A. Yes.
2 Q. Okay.  Does Thelma have any health
3 problems?
4 A. High blood pressure.
5 Q. High blood pressure.  Has she -- has he had
6 any health problems that relate to taking diet drugs,
7 that you know of?
8 A. Not that I know of.
9 Q. Has she ever told you that her chest starts
10 hurting like yours?
11 A. Yes.
12 Q. It does.  Does she ever have any headaches
13 like yours?
14 A. Yes.
15 Q. She does.  Do you know if she's ever seen a
16 doctor about -- about either of those?
17 A. I know she's in and out at the doctor.  You
18 know, I don't know what she goes for.
19 Q. Is she in -- where does she live?
20 A. Macon, Mississippi.
21 Q. Macon.  Does Tonya -- Tonya Lewis live
22 there, too?
23 A. Yes.
24 Q. Your -- your whole family live pretty close
25 together?

Page 119

1 A. Yes.  We're all in walking distance.
2 Q. Okay.  Are you pretty close with Tonya?
3 A. Yes.
4 Q. And with Thelma?
5 A. Yes.
6 Q. And -- okay.  Do they both -- and so do you
7 know if Tonya -- do you know if Thelma is -- is she
8 involved in any litigation involving diet drugs?
9 A. No.
10 Q. No?
11 A. I don't think so.
12 Q. Did Tonya ever take diet drugs?
13 A. No.
14 Q. Okay.  And you said you went over to that
15 clinic -- to that clinic with Thelma and with -- is
16 it Ms. Stallings?
17 A. Right.
18 Q. Is that Brenda?
19 A. Yes.
20 Q. And do you remember either of them -- was
21 it -- you said that you heard some customers talking
22 about going over to see that doctor.  Do you remember
23 if either Thelma or Brenda might have known to go
24 there, that it was -- was it their suggestion to go
25 there?

Page 120

1 A. I don't remember.
2 Q. Don't remember.  Okay.  How old -- how old
3 is -- is Thelma?
4 A. She's 28.
5 Q. Twenty-eight.  So you're the oldest
6 daughter?
7 A. Yes.
8 Q. And there's just three -- three daughters?
9 A. Yes.
10 Q. And two sons?
11 A. Yes.
12 Q. Do you have any first cousins or -- or --
13 or relatives you're pretty close with?
14 A. Yes.  All.
15 Q. All of them?
16 A. Yeah, all of them.
17 Q. Are there any -- can you remember any of --
18 any of your relatives you are close to that might
19 have taken any diet drugs?
20 A. No.
21 Q. No other relatives took diet drugs?
22 A. No.
23 Q. Are there -- are there any -- any of your
24 relatives, you're pretty close to, that you talked to
25 when you were taking diet drugs and told them about

Page 121

1 how you felt, you felt jittery or anything?
2 A. Yes.  It was everyone.
3 Q. Everyone?
4 A. You know, my whole family, because we're
5 all close.  We're all there together.
6 Q. Y'all are there together?
7 A. Yes.
8 Q. Are you closer with any of your cousins
9 than you are your sisters?
10 A. No.
11 Q. No.  Okay.  Do they all -- so do they all
12 know that you're involved in this litigation?
13 A. Well, I don't -- you know, more than -- no
14 more than just family, than what we just --
15 Q. Than just your mom and your dad?
16 A. Yes.
17 Q. Okay.  And your -- your husband knows?
18 A. Yes.
19 Q. Okay.  Were y'all -- were y'all married --
20 I don't know if I remember or not.  Were y'all
21 married when you took diet drugs in '99?
22 A. Yes.
23 Q. You were.  Okay.  Do you have any close
24 friends outside of the family besides Ms. Stallings?
25 A. No.

Sanders, et al. v. Wyeth, et al.　　　　　　Deposition of　　　　　　　　　April 16, 2004
　　　　　　　　　　　　　　　　　　　Mary Sanders

Page 122

1　　Q.　No.  She's -- is she pretty much your only
2　friend outside the family?
3　　A.　Yes.
4　　Q.　Okay.  Do y'all do much socially together?
5　　A.　No.  Just talk on the phone.
6　　Q.　Just talk on the phone.  Do any other
7　ladies work in the shop with you when you're working?
8　　A.　No.
9　　Q.　No.  You're the -- just you're the sole --
10　sole owner and -- and employee?
11　　A.　Yes.
12　　Q.　Okay.  Do you have any regular clients you
13　see all the time?
14　　A.　Yes.
15　　Q.　Any of them that you consider friends, that
16　y'all talk a lot?
17　　A.　Yes.
18　　Q.　And you -- have you talked to your --
19　talked to any of them about your litigation?
20　　A.　No.
21　　Q.　No.  Talked to any of them about taking
22　diet drugs?
23　　A.　No.
24　　Q.　So some of them were talking about taking
25　diet drugs, though, weren't they?

Page 123

1　　A.　Yeah.  That was like, you know, when I was
2　working at one of those beauty shops.
3　　Q.　Do you remember who any of those people
4　were and what -- what they took?
5　　A.　I don't remember.
6　　Q.　Don't remember.  Okay.  All right.  I want
7　to ask you a few questions just generally about
8　weight.  You said your current weight right now is
9　close to 200; is that correct?
10　　A.　Yes.
11　　Q.　And you're -- how tall are you?
12　　A.　Five-one.
13　　Q.　Five-one.  What is the most you've ever
14　weighed?
15　　A.　This is the heaviest I've ever been.
16　　Q.　The heaviest right now.  What's the least
17　you've ever weighed as an adult?
18　　A.　155.
19　　Q.　155?
20　　A.　(Nodded head affirmatively).
21　　Q.　Does your -- has your weight ever, like,
22　just fluctuated, gone up real -- real high and gone
23　back down?  Has it ever done that, or has it just
24　steadily gotten --
25　　A.　Yes, it has fluctuated.

Page 124

1　　Q.　It has fluctuated?
2　　A.　Yeah.
3　　Q.　Are there any -- any specific reasons, that
4　you know of, why it would have gone up and down?
5　Were you -- were you exercising more or dieting when
6　it happened?
7　　A.　I don't know.  I don't know.  I would say,
8　you know, trying to diet or exercise.
9　　Q.　Okay.  Have you ever -- have you ever gone
10　on any diets?  You ever tried to diet much?
11　　A.　Well, the cabbage diet.
12　　Q.　You did -- you tried the cabbage diet?
13　　A.　Basically, that's it.
14　　Q.　That's -- is that the only organized diet
15　you've done?
16　　A.　Yeah.
17　　Q.　Were you -- did you enjoy the cabbage diet?
18　　A.　Unh-unh (Indicating no).  I've always
19　failed.
20　　Q.　Always failed.  Do you remember -- do you
21　remember why it was -- what it is about eating
22　cabbage that supposedly made it that way?
23　　A.　I didn't like the taste.
24　　Q.　Okay.
25　　A.　I didn't -- I didn't like the taste.

Page 125

1　　Q.　Did -- did you lose any weight on it?
2　　A.　No.
3　　Q.　No?
4　　A.　I -- I might have did it a week, if it was
5　a week.
6　　Q.　Did it for a week?
7　　A.　I -- I never stayed on it.
8　　Q.　Have you ever done any -- any other diets
9　like South Beach Diet or the Atkins Diet?
10　　A.　No.
11　　Q.　No.  Have you ever belonged to any kind of
12　diet program, like -- like Weight Watchers or
13　something maybe through a church or anything?
14　　A.　NutriSystem.
15　　Q.　NutriSystem.  Where -- where were you a
16　part of NutriSystem?
17　　A.　In Columbus.
18　　Q.　In Columbus?
19　　A.　Yes.
20　　Q.　How long did you do NutriSystem?
21　　A.　I probably did like a total -- maybe like a
22　month --
23　　Q.　A month?
24　　A.　-- if it was a month.
25　　Q.　Did you have any success?

Sanders, et al. v. Wyeth, et al.

Deposition of
Mary Sanders

April 16, 2004

Page 126

1   A.  No.
2   Q.  No.  Sorry.  Did you -- have you ever done
3  anything else just on your own, like any kind of --
4  just diets maybe you picked up out of a book and
5  tried to do or anything?
6   A.  No.
7   Q.  No.  What about -- what about exercise
8  programs?  Have you ever belonged to a gym?
9   A.  Yes.
10  Q.  What -- do you currently belong to a gym?
11  A.  No.
12  Q.  What -- what gym did you belong to?
13  A.  Jim's Gym in Macon, Mississippi.
14  Q.  Okay.  Did -- were you pretty active there
15 when you belonged?
16  A.  I don't guess I was too active, but I went.
17  Q.  About -- about how often?
18  A.  Maybe about once or twice a week.
19  Q.  Okay.  Well, how long did you go?
20  A.  Well, I had a six-month membership, so I --
21 I didn't -- I just had to pay the money.  So --
22  Q.  Right.  Right.  About when -- when would
23 this have been, a couple of years ago or --
24  A.  No.  About six months ago.
25  Q.  About six months ago?

Page 127

1   A.  Yes.
2   Q.  Okay.  What did you do at the gym?  Did
3  you -- did you do weights, or did you just walk on a
4  treadmill or --
5   A.  Well, I tried to lift weights, and I walked
6  on the treadmill maybe like five or ten minutes.
7   Q.  Okay.
8   A.  Then I'd get tired and go home.
9   Q.  What -- when you -- when you were doing
10 weights and stuff, did you ever -- did you ever just
11 feel worn out and exhausted while you were doing
12 that?
13  A.  Yes.
14  Q.  Did your chest ever start hurting while you
15 were doing it?
16  A.  Yes.
17  Q.  It did.  Did -- did -- did your chest
18 always hurt?
19  A.  Yes.
20  Q.  Okay.  What about shortness of breath?
21  A.  Yes.
22  Q.  You felt out of breath?
23  A.  Yes.
24  Q.  What about -- what about your headaches?
25 Did they ever come on while you were --

Page 128

1   A.  Yes.
2   Q.  They did.  Did you ever feel lightheaded
3  and dizzy?
4   A.  Yes.
5   Q.  Okay.  Did you -- and did you ever -- were
6  you ever able to work out without any discomfort?
7   A.  No.
8   Q.  No.  Okay.  Any other exercise programs you
9  ever belonged to, like --
10  A.  No.
11  Q.  -- you know, an aerobics class or a swim
12 class or anything?
13  A.  No.
14  Q.  No.  Have you ever tried any exercising on
15 your own?
16  A.  Yes.
17  Q.  What type exercises do you do?
18  A.  Walking.
19  Q.  You walk?
20  A.  Uh-huh (Indicating yes).
21  Q.  Do you walk with friends and family or just
22 by yourself?
23  A.  Sister.
24  Q.  Sister?
25  A.  Yes.

Page 129

1   Q.  Which sister?
2   A.  Tonya.
3   Q.  With Tonya.  Do y'all -- do y'all do that
4  now?
5   A.  Every now and then --
6   Q.  Every now and then?
7   A.  -- she'll try to get me to go.
8   Q.  About -- about how far do y'all walk?
9   A.  I probably would almost get in a half a
10 mile.
11  Q.  Half a mile.  And about how frequently do
12 you do that?
13  A.  Every blue moon.  This is embarrassing.
14  Q.  Well, the weather is nice now.  Maybe you
15 can have more chance.  Do y'all walk around the
16 house, or do y'all go to a track?
17  A.  Go to a track, walking track.
18  Q.  Go to a track.  Is there a track there in
19 Macon you go to?
20  A.  Yes.
21  Q.  Okay.  Did you ever do any exercising, say,
22 15 years ago, when -- when you were younger, back
23 in -- maybe before your children were born?
24  A.  Oh, yeah.  We used to walk a lot.
25  Q.  You used to walk a lot.  You used to walk a

Sanders, et al. v. Wyeth, et al.                          Deposition of                                        April 16, 2004
                                                          Mary Sanders

Page 130

1  lot more?
2      A.  Uh-huh (Indicating yes).
3      Q.  Did you ever do any weights or aerobics
4  back then?
5      A.  No.  Just mostly walking.
6      Q.  Okay.  All right.  Do you -- do you
7  currently take care of your house?  Do you -- are you
8  in charge of the cleaning and cooking and everything?
9      A.  Yes.
10     Q.  Are you able to take care of it well?
11     A.  Not like I used to.
12     Q.  Not like you used to.  Why is that?
13     A.  Be tired.
14     Q.  You get -- you get tired?
15     A.  Get tired.
16     Q.  You get -- your chest ever hurt when
17  you're --
18     A.  Chest hurts, head hurts.
19     Q.  Are you -- what are you pretty much
20  responsible for, all of the house work or --
21     A.  Well, I have all of the house work, you
22  know.  My husband takes care of everything else.  I
23  do the house work.
24     Q.  Okay.  He does the yard work and stuff?
25     A.  Yes.

Page 131

1      Q.  What about cooking?  Are you -- do you do
2  breakfast, lunch, and dinner or --
3      A.  Yes.
4      Q.  Okay.  You said that you can't do it like
5  you used to.  What were you -- what did you used to
6  be able to do?
7      A.  Well, like every other week, you know, I
8  would probably just change around the house, like
9  different rooms, you know.  Just switched from this
10  room to that room and just did a thorough cleaning.
11     Q.  When you say switch, what are you -- are
12  you switching, like -- like taking the linens off the
13  bed and stuff or --
14     A.  Well, I used -- could be, like, take the
15  living room and bedroom, make the bedroom the living
16  room --
17     Q.  Okay.
18     A.  -- the living room, the bedroom.
19     Q.  All right.
20     A.  I used to do that all of the time.
21     Q.  Okay.
22     A.  Now I don't even do it anymore.
23     Q.  Y'all just -- you used to pick up and move
24  all of the furniture?
25     A.  Uh-huh (Indicating yes).

Page 132

1      Q.  But you don't do it anymore?
2      A.  Unh-unh (Indicating no).
3      Q.  Is that -- you just -- you feel just too
4  winded?
5      A.  Uh-huh (Indicating yes).
6      Q.  Okay.
7      A.  And then, when my chest tightness, you
8  know, after that, I stop or something.
9      Q.  All right.  But are you still able to work
10  like you used to, though, put the same hours in?
11     A.  Well, yeah.  I worked, but I never
12  worked -- really worked hard.
13     Q.  Right.  Okay.
14     A.  I'd be there, but I never really worked
15  hard.
16     Q.  Okay.  What about -- what about -- how late
17  do you stay up these days?  Do you find yourself
18  wanting to fall asleep a lot earlier, or do you stay
19  up pretty late?
20     A.  I lose a lot of sleep.
21     Q.  You lose a lot of sleep.  Do you have a lot
22  of sleepless nights?
23     A.  Yes.
24     Q.  Okay.  Do y'all -- do you ever -- do you
25  ever find yourself just so exhausted, that you go to

Page 133

1  bed at 7 o'clock or --
2      A.  Yes.  But I -- I mean, I lay there, but I
3  don't -- I don't be asleep.
4      Q.  Because you're restless?
5      A.  Yes.
6      Q.  Okay.  Have you -- have you taken any
7  other -- done anything else -- besides the little
8  dieting and exercise and taking diet drugs, have you
9  done anything else to try to lose weight?
10     A.  No.
11     Q.  Okay.  Has any -- have any doctors ever
12  talked to you about -- about your weight, ever told
13  you that you should probably loose weight?
14     A.  Yes.
15     Q.  Which -- which doctors?  Do you remember?
16     A.  I'm trying to think of his name.  It was at
17  Starkville Clinic for Women.
18     Q.  Uh-huh (Indicating yes).
19     A.  Well, they have five doctors, and I'm
20  trying to think of the second one.
21     Q.  But you would have been there for a
22  gynecology visit?
23     A.  Yes.
24     Q.  And one -- one of the doctors there told
25  you --

Sanders, et al. v. Wyeth, et al.                    Deposition of                                April 16, 2004
                                                    Mary Sanders

Page 134

1     A.   That I was, you know, overweight.
2     Q.   Did they suggest you try to lose weight?
3     A.   Yes.
4     Q.   Did they tell you anything on -- advise you
5   on how to lose weight?
6     A.   Diet and exercise.
7     Q.   Diet and exercise.  Did they give you any
8   specific exercises or a diet plan?
9     A.   No.
10    Q.   Okay.  Did they tell you -- did they tell
11  you what will happen if you don't lose weight, or did
12  they --
13    A.   No.
14    Q.   Did they -- did they say that your weight
15  was causing any -- any problems for you?
16    A.   No.
17    Q.   Do you remember -- do you remember talking
18  to them and telling them -- I mean, you can -- did
19  you bring up the subject?  Were you concerned?
20    A.   No.  We were just looking at the chart one
21  day.  I was just saying -- it was just a general
22  conversation, looking at the chart.  That's all.
23    Q.   And he said -- was it a he or she?  Do you
24  remember?
25    A.   It was a guy.

Page 135

1     Q.   It was a guy.  And he said you're -- Ms.
2   Sanders, you're -- you might need to be worried about
3   your weight?
4     A.   Yes.
5     Q.   Okay.  Did he tell you at all that you may
6   have health problems because of it?
7     A.   No.
8     Q.   Has any physician ever told you, you may
9   have health problems, being overweight?
10    A.   No.
11    Q.   Are you generally aware that overweight
12  people sometimes have health problems?
13    A.   Yes.
14    Q.   Do you know what any of those health
15  problems might be?
16    A.   No.
17    Q.   Okay.  Has anyone ever told you that high
18  blood pressure may be a problem for people that are
19  overweight?
20    A.   Yes.
21    Q.   Who would have told you that?
22    A.   My sister --
23    Q.   Your sister?
24    A.   -- and brother, mother, you know, because
25  my brother and my sister both are overweight --

Page 136

1     Q.   Okay.  And they --
2     A.   -- and have high blood pressure.
3     Q.   -- have high blood pressure?
4     A.   Yes.
5     Q.   Okay.  What about -- what about any other
6   problems?  Diabetes might be caused by weight.  Has
7   anyone ever told you that?
8     A.   No.  I -- no.
9     Q.   No.  Okay.  Do you -- have you heard of any
10  other specific problems people might have that are
11  overweight?
12    A.   No.
13    Q.   Okay.  Do you understand that heart disease
14  sometimes is related to weight?
15    A.   No.
16    Q.   Okay.  Has anyone ever told that -- or any
17  physician or lay person ever told you that
18  respiratory problems sometimes are caused by being
19  overweight?
20    A.   Like what?  For instance, like shortness of
21  breath?
22    Q.   Yeah.  Things like that.
23    A.   Yeah.  I have -- I have heard.  I've never,
24  you know, talked to a physician on it, but I have
25  heard it.

Page 137

1     Q.   Okay.  You just heard it from a regular
2   person?
3     A.   Yes.
4     Q.   Okay.  Has anyone ever told you that people
5   that are overweight sometimes are more fatigued than
6   other people?
7     A.   Yes.
8     Q.   Okay.  Who would be that -- would that have
9   been a doctor?
10    A.   No.
11    Q.   No?
12    A.   Just conversation.
13    Q.   Okay.  Has anyone ever told you that people
14  that are overweight may have -- their joints might
15  hurt more than someone who isn't?
16    A.   No.  I've never heard that.
17    Q.   Okay.  What about that people whose ankles
18  and feet swell sometimes might be due to weight?
19    A.   Yes.
20    Q.   Has a physician ever told you that?
21    A.   No.
22    Q.   Okay.  Have you ever felt any --
23  experienced any kind of depression based on your
24  weight?
25    A.   No.

Sanders, et al. v. Wyeth, et al.                    Deposition of                           April 16, 2004
                                                   Mary Sanders

Page 138

1    Q.  No.  Have you ever felt that your weight,
2  at all, has had a negative impact on your marriage?
3    A.  No.
4    Q.  No.  Okay.  Have you ever felt that you
5  have -- your weight has had a negative impact on any
6  of your friendships or anything?
7    A.  No.
8    Q.  Okay.  When you were younger, were you able
9  to exercise more than you are now?
10   A.  Yes.
11   Q.  Do you remember if you weighed less then or
12 about the same?
13   A.  I weighed less.
14   Q.  You weighed less.  Can you remember any,
15 like, specific activities you used to do when you
16 were much younger, that you can't do now?
17   A.  I just used to walk.
18   Q.  You used to be able to walk.  What --
19 what -- walk a lot further and a lot longer?
20   A.  Well, I think we used to walk maybe like a
21 mile, a mile and a half --
22   Q.  Okay.
23   A.  -- with my mom.  You know, we used to
24 exercise then.
25   Q.  Right.  Do you remember about how long ago

Page 139

1  that would have been?
2    A.  I think in '88 --
3    Q.  '88?
4    A.  -- or '89.
5    Q.  Okay.  Do you ever ride a bike, a bicycle?
6    A.  Yes.
7    Q.  You do?
8    A.  Yeah.
9    Q.  Do you ever -- do you ride -- ride pretty
10 regularly?
11   A.  Not now.
12   Q.  Not now.  Did you ever -- used to, though,
13 in the past?
14   A.  Yes.
15   Q.  Did you ever ride, like, for long
16 distances?
17   A.  Maybe like a mile or two miles.
18   Q.  Mile or two.  Did you ever ride -- you ride
19 with your family?
20   A.  Well, he was my -- my husband.  Well, he
21 was my boyfriend at the time.
22   Q.  Okay.  Y'all would go on bike rides?
23   A.  Yes.
24   Q.  Okay.  How would you say your relationship
25 with your -- with your husband is today?

Page 140

1    A.  It's fine.
2    Q.  Is it pretty good?
3    A.  Yes.
4    Q.  Do y'all -- do y'all still -- are y'all
5  still able to do a lot of things together?
6    A.  No.
7    Q.  No.  Why -- why would that be?
8    A.  Headaches.  Just be tired.
9    Q.  Headaches and tired?
10   A.  Yeah.
11   Q.  Is he -- is he able -- is he -- does his
12 job let him -- let him come around the house a lot.
13 Is he --
14   A.  Well, he comes home on the weekends.
15   Q.  He comes home on the weekends?
16   A.  Yeah.
17   Q.  So during the week, he's not around.  He's
18 on the road?
19   A.  He's on the road.
20   Q.  Okay.  On weekends, are y'all able to get
21 much done with you working?
22   A.  When I get off on Saturdays, you know,
23 that's supposed to be family day.
24   Q.  Right.
25   A.  But I'll be too tired, so --

Page 141

1    Q.  All right.
2    A.  -- we'll go sit and watch a movie or
3  something.
4    Q.  Okay.  Did y'all ever, in the past, used to
5  go out and do stuff?
6    A.  Yes.
7    Q.  What -- what -- what kind of activities did
8  you and your husband used to do?
9    A.  We used to go all the time, like to
10 Memphis, Columbus --
11        (After a discussion off the record,
12 the deposition continued as follows:)
13   Q.  (By Mr. Blount)  Sorry to interrupt you.
14   A.  That's okay.  You know, Jackson.  Just go
15 shopping or just, you know, spend the night out, you
16 know, a day out --
17   Q.  Okay.
18   A.  -- you know, away from home.
19   Q.  Right.
20   A.  Swimming.  Just do a lot of that.
21   Q.  Do you -- did y'all used to swim a lot?
22   A.  Well, I used to sit in the pool.  I
23 wouldn't swim because I don't how to swim.
24   Q.  Okay.
25   A.  You know, just sit in the pool.

Sanders, et al. v. Wyeth, et al.

Deposition of
Mary Sanders

April 16, 2004

---

Page 142

1   Q.   All right.  Well, do you -- so is this back
2   before your children were born or after they were
3   born?
4        A.   You know, I think it was like after they
5   was born.  It was just when they was little kids.
6        Q.   Okay.
7        A.   My little girl was like two years old.
8        Q.   She's two now?
9        A.   No.  She's --
10       Q.   Oh.
11       A.   She's five now.
12       Q.   Back when she was two?
13       A.   Yeah.
14       Q.   Okay.  So about three years ago --
15       A.   Yeah.
16       Q.   -- y'all used to do a lot more?
17       A.   Was it like three ago?
18       Q.   Is she five now?
19       A.   Yeah, she's five.  Yeah.
20       Q.   Well, has he had the same job for some
21   time?
22       A.   Yes.
23       Q.   He's had the same route for a while?
24       A.   Well, he's always been a truck driver.
25       Q.   Right.

---

Page 143

1        A.   And basically, on the weekends, he's always
2   at home.
3        Q.   Okay.  All right.  Are you -- now, when
4   he's gone, do you do all of the shopping?  Do you get
5   the groceries?
6        A.   You know what?  I shop when it's time to
7   cook for that particular day.
8        Q.   Okay.  So you --
9        A.   But I don't, you know, go to the grocery
10   store like -- like I used to.
11       Q.   You don't go like you used to?
12       A.   Unh-unh (Indicating yes).
13       Q.   Well, what did you used to do?
14       A.   Usually, I'd go to the grocery store and
15   shop, you know, get everything we need for that
16   month, grocery shop.  And now I be tired, so I don't
17   even go.
18       Q.   Okay.  Do you go -- so do you go just about
19   every day, then, to try to make -- make dinner?
20       A.   Well, I don't cook every day.
21       Q.   You don't cook every day?
22       A.   No.
23       Q.   About how often do you cook now?
24       A.   Maybe like once or twice a week.
25       Q.   Once or twice a week.  And you'll just stop

---

Page 144

1   by the store and pick up what you need?
2        A.   Well, my mother-in-law takes care of my
3   children.
4        Q.   Okay.
5        A.   You know, I'm at work, and she takes care
6   of my kids.
7        Q.   Where -- where are your kids during the
8   day -- I mean during the -- on Monday through
9   Thursday?
10       A.   School.  And when they're home from school,
11   they're home with me.
12       Q.   Okay.
13       A.   You know, and my mother-in-law stays
14   next -- right next door --
15       Q.   All right.
16       A.   -- so she, you know, does all of the
17   cooking.
18       Q.   Are you pretty close to your mother-in-law?
19       A.   Yes.
20       Q.   She -- she sounds like she does a good job?
21       A.   Yes.
22       Q.   Do you pay her for taking care of your
23   kids, or does she --
24       A.   Yes.
25       Q.   Oh, you do.  Okay.

---

Page 145

1        A.   When I try to pay her, she'll take it.  And
2   sometimes she won't.  But --
3        Q.   Okay.
4        A.   -- I have a -- a grand mother-in-law.
5        Q.   All right.  Is all of your husband's family
6   right there by y'all?
7        A.   Yes.  That's his family.
8        Q.   Okay.  Are you close to any of his brothers
9   or sisters?
10       A.   Yes.
11       Q.   Pretty close?
12       A.   His sister.
13       Q.   His sister.  What's his sister's name?
14       A.   Indian Sanders.
15       Q.   Did you say India?
16       A.   Indian Sanders.
17            THE COURT REPORTER:  Can you spell it,
18   please?
19       A.   Indian, I-N-D-I-A-N.
20       Q.   (By Mr. Blount)  Okay.  And does she live
21   there next to y'all?
22       A.   Yes.
23       Q.   Do you and Indian talk very much?
24       A.   No.
25       Q.   No.  Okay.  Does she help y'all with your

---

Sanders, et al. v. Wyeth, et al.              Deposition of                           April 16, 2004
                                              Mary Sanders

Page 146

1    kids at all?
2        A.  She just lives there.
3        Q.  She just lives there?
4        A.  She just lives there.
5        Q.  All right.  What -- what would you say is
6    an average day for you on the days that you don't
7    work, Sunday -- or Monday through Wednesday?
8        A.  What you mean, average day?
9        Q.  Like the average activities.  Like, what --
10   what do you normally get up -- what time do you
11   normally get up in the morning?
12       A.  I get up every morning at 6:00.
13       Q.  To get your kids ready for school?
14       A.  Get the kids ready for school.
15       Q.  Does that -- do you ever get -- does that
16   ever wear you out trying to get them ready for
17   school?
18       A.  Yes.
19       Q.  It does?
20       A.  Yes.
21       Q.  You get -- does your chest ever hurt while
22   you're trying to get them ready?
23       A.  Uh-huh (Indicating yes).
24       Q.  Do you get up and fix them breakfast?
25       A.  No.  They eat breakfast at school.

Page 147

1        Q.  Okay.  What about -- do you have to get
2    them -- have to get them dressed, or do they pretty
3    much take care of that?
4        A.  My little girl, I just comb her hair.
5        Q.  Okay.  And then after they go to school,
6    pretty much, what do you do with the rest of the day?
7        A.  This is embarrassing.  I go back to sleep.
8        Q.  You go back to sleep?
9        A.  Yes.
10       Q.  I don't blame you one bit.  I wish I could.
11   But -- so how -- about how late do you sleep, then?
12       A.  Approximately like -- maybe like 1:00 or
13   2:00.  I don't really be asleep.  I'll just be laying
14   there watching TV.
15       Q.  All right.  And then, what do you -- what
16   do you do when you get up?
17       A.  Just anything.  I don't just say get up and
18   cook, you know, clean up the house.  It's -- the
19   house is not dirty now.
20       Q.  Right.
21       A.  So, you know, I straighten up and basically
22   just lounge around the house.  I'll put it like that.
23       Q.  And then your kids get home in the
24   afternoon from school?
25       A.  Uh-huh (Indicating yes).

Page 148

1        Q.  Do they come and -- do they come to your
2    house?
3        A.  Yeah.  They come home --
4        Q.  Okay.
5        A.  -- you know.  You know, I'll cook
6    sometimes, maybe like, you know, something that's not
7    hard, that I don't have to run out to the store.
8        Q.  Right.  Right.
9        A.  And mostly, my -- the mother-in-law -- my
10   mother-in-law cooks.  So --
11       Q.  Okay.  Does she come over to your place and
12   cook, or does -- do they go over to her place?
13       A.  Her house.
14       Q.  Okay.  Do you usually go over there and
15   eat, too?
16       A.  No.
17       Q.  No.  Okay.  So what do -- do you do
18   anything in the evenings --
19       A.  No.
20       Q.  -- routinely or anything?
21       A.  No.
22       Q.  Do you -- do y'all go to church?
23       A.  Yes.
24       Q.  Where do y'all go to church?
25       A.  Mt. Cormel Baptist Church.

Page 149

1        Q.  There in Macon?
2        A.  Yes.
3        Q.  Okay.  Are you pretty active in the church?
4        A.  No.
5        Q.  No?
6        A.  I don't do anything in the church.  I just
7    go to church.
8        Q.  About how often do y'all go?  Do you go on
9    Sunday morning?
10       A.  Well, they go just about every other
11   Sunday, and I may go -- I might go like once a month,
12   maybe twice a month.
13       Q.  But -- but your -- your kids go every --
14   about ever other Sunday?
15       A.  Just about every other Sunday.
16       Q.  Is that where all of your family goes?
17       A.  Yes.
18       Q.  Is that where your -- your husband's family
19   goes, too?
20       A.  Yes.
21       Q.  Okay.
22           MR. FORD:  Let me change this tape.
23           MR. BLOUNT:  Sure.
24           MR. FORD:  This concludes Tape No. 1
25   of the deposition of Mary F. Sanders, taken on April

Page 150

1  the 16th, 2004.  The time is 12:21 p.m.  We're off
2  the record.
3            (After a discussion off the record,
4  the deposition continued as follows:)
5            MR. FORD:  This begins Tape No. 2 in
6  the continuing deposition of Mary F. Sanders, taken
7  on April the 16th, 2004.  The time is 12:40 p.m.
8  We're on the record.
9       Q.  (By Mr. Blount) Okay, Ms. Sanders.  I
10  asked some questions about -- back to your -- some of
11  the -- related to your -- the work you do?
12       A.  Uh-huh (Indicating yes).
13       Q.  Have you ever had to stay home from work
14  because of your -- your chest hurting you or your --
15  your headaches?  Did you ever --
16       A.  Yes.
17       Q.  About how frequently does that happen?
18       A.  On a scale of what?
19       Q.  Well, I mean, like, say, on -- on an
20  average month, how many days do you have to take off
21  because -- because of your headaches and your chest
22  pains or -- or any condition that you relate to your
23  taking diet drugs?
24       A.  Well, with my chest pain, I've had to stay
25  home maybe like once or twice within the past couple

Page 151

1  of years.
2       Q.  Okay.
3       A.  But like I say, with my chest, it tightens
4  up, and I just relax.  And then after a while, it'll
5  pass over.
6       Q.  Okay.
7       A.  But that first headache -- it happens so
8  often, that I just can't take off work, you know,
9  every time I get a headache.
10       Q.  Right.
11       A.  I just try to just work through it.
12       Q.  Do you feel like you've lost any clients
13  because of that, because of your --
14       A.  No.
15       Q.  -- headache or having to take off a couple
16  of days?
17       A.  No.
18       Q.  No.  Okay.  Are you claiming lost wages in
19  your current lawsuit?  Do you know?
20       A.  I don't know.
21       Q.  Don't know.  But do you think you've lost
22  any money because of taking diet drugs?
23       A.  I think I could have made more.
24       Q.  You could have made more?
25       A.  I could have worked more.

Page 152

1       Q.  Do you have an idea of maybe how much
2  money, maybe, you lost?
3       A.  No.
4       Q.  No.  Can you think of maybe how many days
5  you've missed as a result of -- total days of -- of
6  either having -- your chest hurting or your head
7  hurting or -- or days you've had to take off to come
8  talk to your attorney?
9       A.  No, unh-unh (Indicating no).
10       Q.  Excuse me.  Has any doctor ever told you
11  that you need to -- that you need to stay home
12  because of your condition?
13       A.  No.
14       Q.  Okay.  Do you remember what -- you -- you
15  said last year, you filed your income taxes for
16  $6,000; is that correct?
17       A.  Yeah -- well, 2004.
18       Q.  2004?
19       A.  6,000.
20       Q.  Okay.
21       A.  No.  2003 income tax.
22       Q.  2003.  Okay.
23       A.  Sorry.
24       Q.  Well, I was about to say, if you've made
25  $6,000 already, that's pretty good.  When you were

Page 153

1  taking your -- taking the diet drugs prescribed by
2  Dr. Henson, you said they made you feel jittery?
3       A.  Yes.
4       Q.  Did they make you stay awake?  Could you --
5  could you sleep while you were on them?
6       A.  No.
7       Q.  No?
8            MS. TOLLE:  Could you clarify the
9  answer to that question as far as, no, that they made
10  you stay awake, or, no, that you couldn't sleep?
11       A.  Oh.  I -- you know, I could sleep, but, you
12  know, I was always jittery like I always had to do
13  something.
14       Q.  Okay.
15       A.  And then I would just -- you know, when it
16  was time to go to bed, you go to bed.  You know, I'd
17  just lay down and mostly just watch TV --
18       Q.  Okay.
19       A.  -- until I would finally go to sleep.
20       Q.  Did you -- did you lose -- you didn't --
21  did you lose weight on that -- on diet drugs?
22       A.  No.
23       Q.  No.  Not even a couple of pounds?
24       A.  Not that -- no.
25       Q.  No?

Page 154

1    A.  You know, I really didn't do a lot of
2  weighing or notice my clothes --
3    Q.  Did you try to diet while you were on them?
4    A.  No.
5    Q.  Did you do any exercise while you -- while
6  you took the drugs?
7    A.  No.  You know, I might have walked a little
8  bit.
9    Q.  Okay.
10    A.  I -- I don't remember.
11    Q.  Did anybody tell you, you looked better,
12  that you looked like you had lost weight?
13    A.  No.
14    Q.  No.  Have you been back to see Dr. Henson
15  at all since the last prescription?
16    A.  No.
17    Q.  Okay.  Have you been back to the pharmacy,
18  Kmart Pharmacy in Mobile, since then?
19    A.  No.
20    Q.  Okay.  And you -- correct me if I'm wrong,
21  but you said earlier that you've never talked to a
22  doctor about taking diet drugs?
23    A.  No.
24    Q.  Okay.  What all -- what all medical
25  conditions are -- are you alleging in this lawsuit?

Page 155

1    A.  Well, headache, fatigue, chest pains,
2  nauseated.
3    Q.  And what do you think these are symptoms
4  of?  Do you think that there's -- is there a certain
5  condition that you claim that you have?
6    A.  No.
7    Q.  No.  What about the conditions that are
8  listed on that echocardiogram of Dr. Tai's that -- on
9  the exhibit there?
10    A.  Well, I -- I really don't understand that.
11    Q.  Okay.  But you don't feel -- do you feel
12  like your heart is normal?
13    A.  No.
14    Q.  No.  Do -- is there any specific thing
15  about -- about your heart maybe you think is wrong?
16    A.  Just when it beats real fast, you know,
17  chest tightening.  I know that shouldn't happen like
18  that all of the time.  And just, like, as far as just
19  having headaches and being out of breath, if I walk
20  from here to there --
21    Q.  Right.
22    A.  -- I feel like I'm about to pass out.
23    Q.  Okay.
24    A.  I don't think all of that's normal.
25    Q.  Okay.  And do you think this was caused by

Page 156

1  taking diet drugs?
2    A.  I don't know.
3    Q.  You don't know.  Has anyone told you that
4  that's -- this is caused by taking diet drugs?
5    A.  No.
6    Q.  What made you -- what made you start to
7  think that maybe they -- it was caused by diet drugs,
8  maybe there was a relationship between taking diet
9  drugs and your health problems?
10    A.  No more like -- say that again.
11    Q.  I'm sorry.  What -- what made you think
12  that maybe your health problems -- that there was a
13  relationship between your health problems and the --
14  the diet drugs you took?
15    A.  Well, I have heard some people have died
16  from the pill.  And I know I -- I have taken them,
17  and I know it would -- you know, complain of chest
18  pains.
19    Q.  Uh-huh (Indicating yes).
20    A.  You know, you read about it and hear about
21  it.
22    Q.  What exactly have -- what -- you said some
23  people -- you heard some people had died from taking
24  the pills?
25    A.  Yeah.

Page 157

1    Q.  What -- do you remember what pills?
2    A.  I don't know what pills, but I know it was,
3  you know, fen-phen.
4    Q.  Fen-phen?
5    A.  And I know phentermine -- I know that had
6  to be related, just some type of related.
7    Q.  Did someone tell you that was related to
8  it?
9    A.  No.  You know, no one -- just talking, you
10  know, to people.
11    Q.  Uh-huh (Indicating yes).  You said that you
12  had seen the -- you had seen some things about it
13  on -- you mean on television?
14    A.  Like -- yeah.  Like TV and Internet.  You
15  know how you just read it, and someone has died --
16    Q.  Uh-huh (Indicating yes).
17    A.  -- from taking diet drugs pills.
18    Q.  Right.  Do you remember -- do you remember
19  what -- maybe what program you saw that talked about
20  diet drugs pills?
21    A.  No.  Just -- you know, just if you scan
22  through the Internet and just seeing about it,
23  reading it.
24    Q.  Did you remember any -- any web sites on
25  the Internet you were on that talked about it?

Sanders, et al. v. Wyeth, et al.

Deposition of
Mary Sanders

April 16, 2004

Page 158

1    A.   No.
2    Q.   Okay.  How did you come to hire the --
3  your -- your current attorneys?
4    A.   I don't remember.
5    Q.   Do you remember if anybody told you that
6  the Colom Law Firm was a good firm, that you should
7  go talk to them?
8    A.   No.  I don't -- I -- I don't remember.
9  I -- I don't even remember how it got started.  I
10  forgot.
11    Q.   Do you remember seeing maybe any
12  advertisements from the Colom firm?
13    A.   No.  Actually -- you know, and Macon is a
14  small town.
15    Q.   Right.
16    A.   And you hear word of mouth, you know, that
17  it was a lawsuit.  They was checking up on those diet
18  pills that -- because mostly everybody in Macon went
19  to Gordo.
20    Q.   Okay.
21    A.   And so, you know, one just followed the
22  other.  We were just going to see what was going on.
23    Q.   All right.  So you -- you knew a lot of
24  people, then, that took diet drugs?
25    A.   You know, I know a lot of people that took

Page 159

1  them, but not just talking to people like, you know,
2  hey, let's go do this pill or do that pill.
3    Q.   Right.
4    A.   But like I said, it's Macon.  You know, a
5  lot of people went to Gordo to get diet pills.
6    Q.   Okay.  Can you remember anybody else that
7  took them besides Ms. Stallings?
8    A.   Well, there was a lot people in Macon, you
9  know.
10    Q.   Do you remember any of their names?
11    A.   Well, just one.  Lillian Chandler.
12    Q.   Lillian Chandler?
13    A.   Yeah.  And Deborah Jones.
14    Q.   Anybody else?
15    A.   It was -- it was just a lot of people.
16    Q.   Okay.
17    A.   I -- you know, I can't think of all of the
18  names.
19    Q.   Do you remember if -- what pills Ms.
20  Chambers -- you said Chambers?  I'm sorry.  Chandler?
21    A.   Chandler.
22    Q.   Chandler and Jones, do you remember what
23  either one of them would have taken, what pills?
24    A.   No.
25    Q.   Did they ever say they took fen-phen?

Page 160

1    A.   No.  I just know they went to Gordo, and we
2  all went to the same place.
3    Q.   Was it about all the same time?
4    A.   No.  I don't -- I don't know.
5    Q.   Okay.
6    A.   I don't know when they went.
7    Q.   Have you heard either -- that either Ms.
8  Chandler or Ms. Jones are -- are involved in any diet
9  drug litigation?
10    A.   Well, I know they have got paid for it.
11    Q.   They've both been paid for it?
12    A.   Yes.
13    Q.   Have you ever heard them say how much they
14  were paid?
15    A.   No.
16    Q.   Did you ever hear them say that it was a
17  settlement or that it was court hearing, that they
18  won a case?
19    A.   I don't know.  I don't know.
20    Q.   Don't know.  Do you know if they were
21  represented by -- who they were represented by, what
22  attorney?
23    A.   Lillian Chandler, I think the Colom Law
24  Firm.
25    Q.   Colom firm.

Page 161

1    A.   Or Beasley & Adam -- Beasley & Allen --
2  Adam, something --
3        MS. TOLLE:  If you don't know, don't
4  speculate.
5        BY THE WITNESS:  Okay.
6    Q.   (By Mr. Blount)  You're welcome to
7  speculate.  Did either Ms. Chandler or Ms. Jones tell
8  you that you should go see the Colom Law Firm?
9    A.   No.
10    Q.   Okay.  Do you remember any one person
11  saying, hey, Mary, why don't you call up the Colom
12  Law Firm?
13    A.   I don't remember.
14    Q.   You don't.  Okay.  Do you remember -- you
15  don't -- so you don't remember any advertisements
16  involving diet drugs and the Colom Law Firm?
17        MS. TOLLE:  You already asked that.
18  Objection.
19    Q.   (By Mr. Blount)  You -- you can go ahead
20  and answer?
21    A.   I don't know.  I don't know.
22    Q.   You don't know.  When did you first contact
23  the Colom firm?
24    A.   I don't remember.
25    Q.   You don't remember?

Sanders, et al. v. Wyeth, et al.                    Deposition of                    April 16, 2004
                                              Mary Sanders

Page 162

1    A.  It was so long ago, I don't remember.
2    Q.  Do you remember if it was before you went
3  and had your echo done?
4    A.  Yes, it was before.
5    Q.  Okay.  Because they're -- they're the ones
6  that instructed you to get the echo, correct?
7    A.  Right.  Yes.
8    Q.  Okay.  Do you remember if you had already
9  signed on to be a client of theirs before you had the
10  echo?
11    A.  Yes.
12    Q.  You had.  Okay.  Do you remember -- did you
13  try to talk -- did you talk to any other law firms --
14    A.  No.
15    Q.  -- before you talked to them?
16    A.  No.
17    Q.  No.  Okay.  And the Colom firm has never
18  represented you on anything before?
19    A.  No.
20    Q.  Okay.  Have they -- have they ever
21  represented anyone in your family, that you know of?
22    A.  No.
23    Q.  Okay.  Have you talked to -- have you
24  talked to anybody else in your family about whether
25  or not you should have hired them as a law firm?

Page 163

1    A.  No.
2    Q.  No.  Okay.  Have you done any -- any
3  independent research?  You said you got on the
4  Internet, and you looked up some of the diet drugs;
5  is that correct?
6    A.  I don't know as I just looked it up.
7  Just -- I just browsed through the Internet, you
8  know, just reading like so.
9    Q.  Have you ever -- have you seen any --
10  anything on the Internet about some of the problems
11  people have that took -- took any diet drugs?
12    A.  Not that I can recall.
13    Q.  Okay.  Have you looked up any of your
14  symptoms, like -- on the Internet?  Have you looked
15  up chest pain or shortness of breath or anything?
16    A.  No.
17    Q.  Okay.  Have you ever been convicted of a
18  crime?
19    A.  No.
20    Q.  Not a misdemeanor or felony?
21    A.  No.
22    Q.  Ever got a speeding ticket?
23    A.  Yes.
24    Q.  You have.  Was that -- was that in -- was
25  that in Noxubee County?

Page 164

1    A.  No.  Columbus.
2    Q.  In Columbus.  I got several in Columbus
3  myself.  Did you -- did you talk with anybody to
4  prepare for this deposition today?
5    A.  No.
6    Q.  No.  Just talked to your attorney?
7    A.  Yes.
8    Q.  Okay.  Did you review any of the paperwork
9  that's in front of you this morning?
10    A.  No.  No more than you just showed me.
11    Q.  Did you look at anything else this morning
12  to prepare for your --
13    A.  No.
14    Q.  -- the deposition?
15    A.  No.
16    Q.  Okay.  Did you do anything -- anything else
17  to prepare for the deposition yesterday?
18    A.  No.
19    Q.  Okay.  Have you ever talked any of your
20  doctors about bringing this lawsuit?
21    A.  No.
22    Q.  No.  When you -- you said when you -- you
23  had heard of several other lawsuits before you
24  decided to bring your own, is that correct, involving
25  diet drugs, Ms. -- maybe Ms. Chandler's lawsuit or

Page 165

1  maybe Ms. Jones'?
2    A.  Everything was done at the same time.
3  Every -- everybody went and checked out everything in
4  Macon.
5    Q.  Okay.
6    A.  Everything was done at the same time.  You
7  know, as far as, like, how far they went, I don't
8  know.  I just know we all went at the same time --
9  went -- met up in Macon just to hear about what was
10  going on.  And from there, what they did, I don't
11  know.
12    Q.  Now, you said you went up -- did you go to
13  a certain place?
14    A.  Yes.  In Macon.
15    Q.  Where did -- where did y'all go in Macon?
16  I mean, was there -- was there a meeting that was
17  held that you attended?
18    A.  Yeah.  It was just a meeting that was held,
19  yeah.
20    MS. TOLLE:  I'm going to object right
21  now because -- if I can have a minute just to ask her
22  if it goes into the attorney-client privilege ahead?
23    MR. BLOUNT:  Sure.  Go ahead.
24    MS. TOLLE:  We're going to have to
25  step outside.

Sanders, et al. v. Wyeth, et al.                    Deposition of                                    April 16, 2004
                                                   Mary Sanders

Page 166

1        MR. BLOUNT:  That's fine.
2        MR. FORD:  We're off the record.  The
3   time is 12:54 p.m.
4        (After a recess, the deposition
5   continued as follows:)
6        MR. FORD:  We're back on the record.
7   The time is 1:03 p.m.
8        MR. BLOUNT:  Are you -- okay.  Are you
9   objecting to me asking about the meetings she
10  attended?
11       MS. TOLLE:  I'm -- we're right at a
12  fine line.
13       MR. BLOUNT:  Okay.
14       MS. TOLLE:  I object to the point when
15  it starts -- where she starts talking to her
16  attorneys.
17       MR. BLOUNT:  Right.  I understand.
18   Q.  (By Mr. Blount)  The meeting -- you said
19  you attended -- or everybody was attending a meeting;
20  is that correct?
21   A.  Yes.
22   Q.  Was that a lot of people you knew in Macon
23  that were attending the meeting?
24   A.  Yes.
25   Q.  Okay.  Was that meeting held by your

Page 167

1   attorney?
2    A.  No.
3    Q.  Okay.
4    A.  It was just on -- it was talking about diet
5   drugs --
6    Q.  Okay.  Was it --
7    A.  -- and diet pills.
8    Q.  It was a meeting -- someone was talking
9   about diet drugs?
10   A.  Right.
11   Q.  When you attended that meeting, had you
12  already signed up with an attorney?
13   A.  No.
14   Q.  Okay.  Who held -- who held the meeting?
15  Do you know?  Who was in charge?
16   A.  Beasley & Allen.
17   Q.  Beasley & Allen?
18   A.  Yeah.
19   Q.  Are they -- are they a law firm?
20   A.  I don't know if -- I don't know --
21   Q.  Okay.
22   A.  -- were they a law firm or -- I know it had
23  something to do with legal action --
24   Q.  Okay.
25   A.  -- is why they was there.

Page 168

1    Q.  And what -- what -- what happened at the
2   meeting?  Was -- was there a speaker?
3    A.  Well, basically, they were just saying, you
4   know, have you -- have you taken any diet drugs?
5    Q.  Okay.
6    A.  You know, just bring your pills bottles and
7   something like that.  And basically, that's all we
8   did.
9    Q.  And did you have any pills bottles?
10   A.  I don't remember.
11   Q.  Okay.  Do you remember if you turned any
12  pill bottles over to an attorney?
13   A.  I don't remember.  I remember turning
14  something -- I don't remember what I turned over.  I
15  don't remember.
16   Q.  Did -- did the people -- the Beasley &
17  Adams, was there a group of people there representing
18  them?
19   A.  No.  It was one person.
20   Q.  Okay.  Do you remember -- did they tell you
21  that they -- did that person discuss individuals like
22  yourself bringing lawsuits?  Was that the topic of
23  conversation?
24   A.  Say that one more time.
25   Q.  What -- I'm sorry.  What -- basically, what

Page 169

1   was the topic that they talked -- did they tell you
2   about?  Did they tell you about lawsuits, or did they
3   tell you about health problems?
4    A.  It was something about lawsuits.
5    Q.  Okay.
6    A.  Uh-huh (Indicating yes).
7    Q.  Did they -- do you know -- were they
8   soliciting people to sign up to be plaintiffs?
9    A.  No.
10   Q.  Okay.
11   A.  No.
12   Q.  Do you know -- did they -- were they -- did
13  they, at all, tell people what possible health
14  problems they could have?
15   A.  No.
16   Q.  Do you remember any specific drugs that
17  they may have talked about?
18   A.  I don't remember.
19   Q.  But they were talking about diet drugs?
20   A.  Diet drugs.
21   Q.  Okay.
22   A.  Prescribed diet drugs.
23   Q.  What else happened at that meeting?  What
24  else did they -- I mean, did they talk for a while?
25  Was it -- was it like an hour long?

Sanders, et al. v. Wyeth, et al.                 Deposition of                                    April 16, 2004
                                              Mary Sanders

Page 170

1    A.  No.
2    Q.  Do you remember what else -- any general or
3  any -- any specific things that the person would have
4  said?
5    A.  No.  Basically, we just went down there,
6  you know, and -- and signed up, and, you know, gave
7  them whatever you had.  And that was it.
8    Q.  When you say you signed up, what were you
9  signing up for?
10   A.  Well, you fill a piece of paper.  I don't
11  remember what I sign up for or -- like I said, I
12  don't know.  I know he -- you know, he said give me
13  prescribed diet drugs.  And, you know, you're in the
14  town of Macon.  That's what we did.
15   Q.  Okay.  Did -- do you -- do you feel that
16  you were signing up to be represented by an attorney?
17   A.  I don't know.
18   Q.  You don't know?
19   A.  I'm not sure.
20   Q.  Okay.  Did the person promise you any
21  money?
22   A.  No.
23   Q.  No.  Did the person tell you that you were
24  going to be bringing a lawsuit?
25   A.  I don't know.

Page 171

1    Q.  Okay.  Do you remember, at all, if they
2  talked about the Colom Law Firm?
3    A.  No.
4    Q.  Okay.
5    A.  I don't remember that.
6    Q.  Do you remember if the individual that --
7  that y'all talked to, was he -- was he -- did he
8  address you as a group, or did he talk to you one on
9  one?
10   A.  It was a group of us.
11   Q.  Did he -- did he get up kind of like on a
12  podium at church --
13   A.  No.
14   Q.  -- and talk to you?
15   A.  No.
16   Q.  So did people ask him questions and he
17  answered them, or did he just give, like, a prepared
18  speech?
19   A.  I don't know.
20   Q.  Don't know.  Do you remember talking to him
21  individually yourself?
22   A.  Yes.  Just, you know -- it was -- you know,
23  it was a -- it was a lawsuit and -- you know, was
24  there any prescribed drugs -- that was a prescribed
25  drug.  And that was it, and we went from there.

Page 172

1    Q.  Okay.
2         MS. TOLLE:  For the record, I'm -- I'm
3  going to again state an objection.  I'm not sure
4  exactly who it was she spoke with at that point in
5  time and want the objection on the record if it was
6  at all connected with the Colom Law Firm.
7         MR. BLOUNT:  Okay.
8    A.  Well, they didn't mention Colom at all.  I
9  don't -- no.
10   Q.  (By Mr. Blount)  Do you remember ever
11  getting a call back from any of those people -- from
12  that person?  Did you ever talk to them again?
13   A.  I don't remember.  I don't.
14   Q.  Do you remember if any of your -- if any of
15  the people that were there that night, that you knew,
16  ever ended up talking to them again?
17   A.  I don't know.
18   Q.  Okay.
19   A.  I don't remember how -- I don't -- I don't
20  remember none of it.
21   Q.  All right.  At what point did you -- can
22  you remember back at what point you agreed to be a
23  client for the Colom Law Firm or agreed to hire them?
24   A.  No.
25   Q.  Did you -- did you meet with them and sign

Page 173

1  some paperwork saying, I want to be a -- that you're
2  going to represent me?
3    A.  I don't remember how it first -- I don't --
4  I know we signed up with one person, you know, signed
5  some papers.  And it went from there.  So --
6    Q.  Okay.
7    A.  -- I don't know where it went from there.
8  You know, even how it wound up here, I don't know.
9    Q.  Okay.  All right.  Do you remember if Ms.
10  Stallings was at that meeting you attended?
11   A.  I don't know.
12   Q.  Did you go by yourself to that meeting, or
13  did you go with somebody?
14   A.  By myself.
15   Q.  You went yourself.  Did you know a lot of
16  people there?
17   A.  Well, you know, faces.
18   Q.  Do you remember if he talked at all about
19  the drug Pondimin?
20   A.  No.
21   Q.  Okay.  Do you remember if he talked at all
22  about -- did he tell y'all anything about other
23  lawsuits, successful lawsuits that have been filed?
24   A.  No.
25   Q.  Did he tell you anything about people that

Sanders, et al. v. Wyeth, et al.                          Deposition of                                    April 16, 2004
                                                          Mary Sanders

Page 174

1   had settled for large amounts of money?
2       A.   No.
3       Q.   Did he tell any of y'all that you would be
4   taking a echocardiogram test?
5       A.   No.
6       Q.   Is that the only meeting like that you
7   attended?
8       A.   Yes.
9       Q.   Do you know of any other meetings that have
10  occurred like that, maybe unrelated to diet drugs,
11  just for other issues involving lawsuits?
12      A.   Yes.
13      Q.   Have you attended any of those?
14      A.   Yes.
15      Q.   Which -- what other ones have you attended?
16      A.   I can't think of none.
17      Q.   Were there any --
18      A.   I'd go --
19      Q.   -- others related to medicines?
20      A.   No.  No.  No medicines.  Just like
21  financial stuff like that.
22      Q.   Financial.  Do you remember -- do you
23  remember what any of that would have been?
24      A.   First Family and H & R Block.
25      Q.   Okay.  Were these people talking about

Page 175

1   bringing lawsuits?
2       A.   Yes.
3       Q.   Do you remember what the -- what they were
4   going to be suing over?
5       A.   No.
6       Q.   Do you know if any of them talked about
7   suing over mortgages or second mortgages?
8       A.   Oh.  You know, finances.
9       Q.   Finances.
10      A.   Yeah.  You know, getting stuff financed.
11      Q.   I guess --
12          MS. TOLLE:  I'm going to direct you at
13  this point --
14          THE WITNESS:  Okay.
15          MS. TOLLE:  -- don't answer any
16  questions about any conversation you had with any
17  other attorneys --
18          THE WITNESS:  Okay.
19          MS. TOLLE:  -- about any -- that
20  you've hired for anything.
21      Q.   (By Mr. Blount)  Have you -- have you hired
22  any other attorneys for anything?
23      A.   No.  I mean, I was just listening.
24      Q.   Okay.
25      A.   I -- I've never had an attorney.

Page 176

1       Q.   So you -- so you haven't hired any of those
2   other people?
3       A.   No.  I just went to listen.  No.
4       Q.   Okay.  Well, what -- what, then -- do you
5   remember what the subject matters of those -- any of
6   those meetings were?
7       A.   Well -- no.  That was involving my -- with
8   my parents.
9       Q.   Okay.  You went with your parents?
10      A.   I basically just went with my parents.
11      Q.   Did -- were those -- but were those --
12  those were other -- other similar gatherings where
13  they were signing up people for lawsuits?
14      A.   Yes.
15      Q.   Okay.  Can you remember, like, any of the
16  institutions they were looking into selling -- suing?
17      A.   No.
18      Q.   Were they suing banks --
19      A.   I don't know.
20      Q.   -- people that lend money?
21      A.   I don't know.  I just went with them.
22      Q.   Okay.  Do you know, are your parents
23  involved in any lawsuits?
24      A.   (No response.)
25      Q.   Are your parents involved in any lawsuits?

Page 177

1       A.   Now?
2       Q.   Uh-huh (Indicating yes).
3       A.   No.
4       Q.   Okay.  Have -- have they been in the past?
5       A.   Just that one.
6       Q.   Just that one.  Do you remember who they
7   sued?
8       A.   All I know was First Family.
9       Q.   It was First Family?
10      A.   Yes.
11      Q.   Do you know who represented them, what law
12  firm?
13      A.   Colom.
14      Q.   Colom.  Okay.  Would it have been your
15  parents that told you, maybe you should call Colom
16  Law Firm for --
17      A.   No.
18      Q.   -- diet drugs?
19      A.   No.
20          MS. TOLLE:  Don't -- again, don't
21  speculate if you don't know.
22      Q.   (By Mr. Blount)  All right.  So other than
23  the -- other than the meeting you attended with --
24  for diet drugs and the meeting that your parents --
25  you attended with your parents about the financial

Sanders, et al. v. Wyeth, et al.                    Deposition of                          April 16, 2004
                                                   Mary Sanders

Page 178

1  lawsuit, have you attended any other large meetings
2  like that?
3      A.  You know, actually, it wasn't meetings like
4  that.  They just -- they were just, you know, telling
5  people about a lawsuit.
6      Q.  Right.  Right.
7      A.  It had to do with that.
8      Q.  Any other -- any other inform --
9  information?
10     A.  No.  That was just that one time.  No.
11     Q.  Okay.  Have you ever considered suing the
12 doctor that prescribed your drugs to you?
13     A.  I don't know.
14     Q.  Dr. Henson?
15     A.  I don't know.  I just take advice from my
16 lawyer.  I don't -- I don't know what's going on.
17     Q.  Okay.  Would you sue your doctor if you
18 thought you could win some money from him?
19         MS. TOLLE:  I object.
20         MR. BLOUNT:  It's not a conversation
21 she's had with her attorney.
22     Q.  (By Mr. Blount)  If -- did you -- okay.
23 Let me rephrase that.  Do you think -- do you think
24 your physician did anything wrong in prescribing you
25 diet drugs?

Page 179

1      A.  It just was unsafe.
2      Q.  Do you think it was unsafe?
3      A.  If it caused, you know, people to lose
4  their lives, yeah, that, I do.
5      Q.  So do you think Dr. Henson did anything
6  wrong in prescribing you diet drugs?
7      A.  It does if he was aware of it.
8      Q.  If -- if -- okay.
9      A.  If he was aware, you know, what could
10 happen.
11     Q.  If he was aware that -- that -- that the
12 pills were dangerous?
13     A.  Yes.
14     Q.  Okay.  Do you know if he was aware of it?
15         MS. TOLLE:  Object.
16     A.  I don't know.
17     Q.  (By Mr. Blount)  All right.  So to the best
18 of your knowledge, do you know if you're going to try
19 to sue Dr. Henson?
20     A.  I don't know.  I --
21     Q.  Okay.  Do you think pharmacy that you
22 received the drugs at in Mobile did anything wrong?
23     A.  I don't know.
24     Q.  You don't know.  Do you think -- do you
25 think the pharmacy prescribing and giving you the

Page 180

1  diet drugs, do you think that they -- they --
2  did anything in that transaction that hurt you?
3      A.  I think if they was aware of it, you know.
4      Q.  If -- I'm sorry.  Could you clarify what --
5  that, please?
6      A.  If they was aware of -- that, you know,
7  it's going to cost people lives or any complications.
8      Q.  That -- that the pills could?
9      A.  Yes.
10     Q.  The pills they sold you?
11     A.  Right.
12     Q.  Do you -- and you don't remember seeing any
13 kind of warning label?
14     A.  No.
15     Q.  Have you ever heard of any -- have you ever
16 heard of the US Government wanting people that had
17 taken diet drugs to go see a doctor?
18     A.  I don't recall.
19     Q.  Have you ever heard anyone say that the FDA
20 wants people to go see a doctor who has -- who have
21 taken diet drugs?
22     A.  I don't recall.
23     Q.  Have you ever seen a form or filled out a
24 form involving this litigation called an opt-out
25 form?

Page 181

1      A.  Yes.
2      Q.  Okay.  Do you remember signing -- do you
3  remember what it was called, if it was called an
4  intermediate opt-out or a back-end opt-out?
5      A.  I don't remember.
6      Q.  But you do remember signing one?
7      A.  Yes.
8      Q.  Would you have turned that over to your
9  attorney?
10     A.  I got it in the mail, and I mailed it back
11 off.
12     Q.  Okay.
13         MR. BLOUNT:  We're going to have to
14 hold up the deposition to get that.  It hasn't been
15 produced to us --
16         MS. TOLLE:  Oh.
17         MR. BLOUNT:  -- I don't -- I don't
18 believe.
19         MS. TOLLE:  I think we have it.
20         MR. BLOUNT:  Do you?
21         MS. TOLLE:  You guys don't have this?
22         MR. BLOUNT:  It was not sent to me,
23 which -- and it's my understanding I have our -- our
24 complete record.
25         MS. TOLLE:  (Counsel examines

Sanders, et al. v. Wyeth, et al.                 Deposition of                        April 16, 2004
                                              Mary Sanders

Page 182

1  documents).
2        MR. BLOUNT:  If it -- if it helps,
3  Michelle, I haven't seen a back-end opt-out for
4  any -- any plaintiff in this case yet.
5        MS. TOLLE:  I was trying to find a
6  copy.
7        MR. BLOUNT:  If you have it, great.
8        MS. TOLLE:  I thought we had provided
9  that.
10       MR. BLOUNT:  I'm not real sure -- I
11  don't know why we don't have any for this case, but I
12  haven't seen one.
13       MS. TOLLE:  It was in my -- all right.
14  Could we go off the record for a moment?
15       MR. BLOUNT:  Sure.
16       MR. FORD:  We're off the record.  The
17  time is 1:17 p.m.
18       (After a discussion off the record,
19  the deposition continued as follows:)
20       (Thereupon, the document hereinafter
21  referred to as Exhibit No. 5 was marked.)
22       MR. FORD:  We're back on the record.
23  The time is 1:21 p.m.
24    Q.   (By Mr. Blount)  All right, Ms. Sanders.  I
25  want to hand you Exhibit No. 5, which is called

Page 183

1  "ORANGE FORM #3."
2     A.   Uh-huh (Indicating yes).
3     Q.   And this is a diet drug settlement with
4  American Home Products, Orange Form #3.  It's the
5  back-end opt-out.  It's on the top sentence there,
6  underlined.  Have you seen this form before?
7     A.   Yes.
8     Q.   Okay.  Do you remember signing it on the --
9  on the back page here, under No. 3?
10    A.   Yes.
11    Q.   Okay.  That is your signature on October
12  24th, 2002?
13    A.   Yes.
14    Q.   Okay.  And on the front of it, I just want
15  to -- did you fill this information out?  It's typed.
16  Is your name typed here?
17    A.   Yes.
18    Q.   Okay.
19    A.   My eyes are killing me.
20    Q.   Pardon?
21    A.   My head is hurting.  It's my eyes.
22    Q.   Are you okay?
23    A.   Yeah.
24    Q.   Okay.  Do you remember filling out any
25  other paperwork?  There's usually another form that

Page 184

1  goes with this.  I can't remember what it's called.
2  Is this the only -- is this the only form you filled
3  out?
4        MS. TOLLE:  Which one -- the fact
5  sheet?
6     A.   I don't remember.  That's been so long ago.
7     Q.   Okay.  All right.  All right.
8        MS. TOLLE:  Which one are you --
9        MR. BLOUNT:  Is -- is there another
10  form that -- do you know if there's another form that
11  goes with this, just that's more -- has more
12  biographical information and a list of providers that
13  provided diet drugs?
14       MS. TOLLE:  It's not -- not on the
15  fact sheet?
16       MR. BLOUNT:  I think it's got another
17  color name, like the blue form or the turquoise one.
18  I'm not sure.
19       MS. TOLLE:  It's not -- I don't see it
20  in here.
21       MR. BLOUNT:  This is the only one that
22  I really need, but I was just curious.
23       MS. TOLLE:  Yeah.  I don't --
24       MR. BLOUNT:  Okay.
25       MS. TOLLE:  I'll check.

Page 185

1     Q.   (By Mr. Blount)  All right, Ms. Sanders.
2  We've talked about the doctor and the pharmacy.  But
3  obviously, the two pills were manufactured by
4  companies.  Do you have -- do you claim anything was
5  done wrong by these companies in making those --
6  making those pills you took?
7     A.   Only if it costs lives.  That's all I know,
8  you know.  I don't know.
9     Q.   Okay.  Have you been to see a doctor, other
10  than your gynecologist and the dentist, since you had
11  your echocardiogram done?
12    A.   No.
13    Q.   No?
14    A.   Baptist Memorial.
15    Q.   Baptist Memorial?
16    A.   Yeah.  That's when I was having bad chest
17  pains.
18    Q.   When you had bad chest -- you had those
19  after you had your echocardiogram done?
20    A.   Yes.
21    Q.   Okay.  At that point, did you tell anybody
22  in the -- the emergency room that you saw -- that you
23  had -- you were involved in litigation about diet
24  drugs?
25    A.   No.

Sanders, et al. v. Wyeth, et al.                    Deposition of                              April 16, 2004
                                                     Mary Sanders

Page 186

1    Q.  Do you remember telling them, hey, I've
2  had -- I've had a heart test done before?  Did you
3  tell them --
4    A.  No.
5    Q.  Okay.  You didn't tell them about your
6  echo, then?
7    A.  No.  But I was so -- unh-unh (Indicating
8  no).  I didn't even think about that.
9    Q.  All right.  Do you -- about how long after
10  that was -- was your visit to Baptist?
11    A.  I don't remember.  I remember that echo was
12  a while ago.  It was a long time ago.
13    Q.  Was it -- has it been a -- over a year
14  since you went to Baptist?
15    A.  I went to Baptist -- I was really trying to
16  remember, was I working with -- was I working with
17  512 or Brenda's Cutting Edge.  I know it was back in
18  Macon.
19    Q.  Okay.  Has it be within the past 12 months,
20  though?
21    A.  No.
22    Q.  Okay.  Has any attorney told you to go see
23  a doctor other than the echocardiogram --
24    A.  No.
25    Q.  -- you had done?

Page 187

1    A.  No.
2    Q.  What other additional treatments do you
3  think you're going to need as a result of taking diet
4  drugs?
5         MS. TOLLE:  I object to the extent
6  that it calls for a medical conclusion, and she
7  wouldn't know.
8    Q.  (By Mr. Blount)  Do you think you're going
9  to need to be hospitalized in the future because of
10  your heart and -- your heart pains?
11    A.  I don't know.
12    Q.  Don't know.  Do you think you're going to
13  need to take any medicine?
14    A.  If it continues like this, yes.
15    Q.  Okay.  Are you -- are you seeking to
16  recover the price you paid for the drugs you bought?
17    A.  I don't know.
18    Q.  As far as if you win the lawsuit, are --
19  are you hoping that you'll get the money back that
20  you paid for the diet drugs, get your money back for
21  something that hurt you?
22    A.  Rephrase that again.
23    Q.  I'm sorry.  Are -- are -- in -- in this
24  lawsuit, are you -- are you seeking to recover the
25  cost that you paid for the drugs?

Page 188

1    A.  I don't know.
2    Q.  Okay.  All right.  That's all I have.
3  Thank you.
4         MS. TOLLE:  All right.  You guys, did
5  you have some questions, on the phone?
6         MS. LADNER:  I have a few.
7         MS. TOLLE:  Okay.  I don't -- I mean,
8  whichever order you guys want to go in.
9         MS. LADNER:  That's fine.  Emilie, why
10  don't you go first?
11         MS. WHITEHEAD:  Okay.
12         MS. TOLLE:  Can you guys hear okay?
13         MR. BROUILLETTE:  Yes.
14         MS. TOLLE:  Okay.
15         EXAMINATION
16  BY MS. WHITEHEAD:
17    Q.  Ms. Sanders, can you hear me?
18    A.  Yes.
19    Q.  My name is Emilie Whitehead.  I have a few
20  questions to ask you this afternoon.  I'm looking at
21  your two pharmacy records, one for Kmart, showing a
22  prescription for -- showing a prescription for
23  Remeron, I believe, in March of '99.  It is correct
24  that you got the phentermine prescription filled in
25  February of '99 and the Remeron prescription filled

Page 189

1  in March of '99?
2         MS. TOLLE:  Are you talking about the
3  B & O sheet?
4         MS. WHITEHEAD:  Yes.
5         MS. TOLLE:  Okay.  Not the Kmart.  Do
6  you know which one she's talking about?
7         THE WITNESS:  Yes.
8         MS. TOLLE:  Okay.
9         MS. WHITEHEAD:  Well, Michelle, I'm
10  actually talking about one.  The -- the phentermine
11  is on the Kmart list, and the Remeron is on the B & O
12  list.
13         MS. TOLLE:  Okay.  So we're looking at
14  both of them.
15         MS. WHITEHEAD:  Right.
16    Q.  (By Ms. Whitehead)  And as I understand it,
17  Ms. Sanders, you had the prescription for the
18  phentermine filled at the Kmart pharmacy on February
19  the 8th of 1999.  You had the prescription for
20  Remeron filled at B & O Pharmacy in March of 1999.
21  And I am just wondering if that is correct?
22    A.  Yes, ma'am.
23    Q.  As I understand it, Dr. Denzil Robertson is
24  the physician who prescribed the Remeron?
25    A.  Yes.

Sanders, et al. v. Wyeth, et al.                Deposition of                April 16, 2004
                                              Mary Sanders

Page 190

1    Q.   And it's your testimony today that at that
2  time, you were having some chest pains, and that
3  precipitated your visit to Dr. Robertson and the
4  receipt of the Remeron?
5    A.   Yes.
6    Q.   Did you discuss any anxiety that you were
7  having with Dr. Robertson at that time?
8        MS. TOLLE:  I object to the form.
9    Q.   (By Ms. Whitehead)  When you visited with
10 Dr. Robertson prior to his giving you the Remeron
11 prescription, were you experiencing symptoms of
12 anxiety?
13   A.   I was.  Yes.
14   Q.   Were you experiencing symptoms of sadness
15 or loss of enjoyment of life?
16   A.   Yes.
17   Q.   Did Dr. Robertson describe or diagnose you
18 with having an anxiety attack or a panic attack?
19   A.   No, ma'am.  Not that I can recall.
20   Q.   Do you recall if he diagnosed you with
21 suffering from depression?
22   A.   Definitely no.
23   Q.   No.  Are -- are you aware of what the
24 prescription Remeron is prescribed for?
25   A.   No, ma'am.

Page 191

1    Q.   He did not indicate to you why he was
2  giving you that prescription?
3    A.   No.
4    Q.   In March of 1999 or February of 1999, did
5  you have anything going on in your life that was
6  causing you any particular stress or anxiety?
7    A.   No.
8    Q.   Okay.  Did you have anything that was
9  causing you to be sad?
10   A.   No.
11   Q.   Were you having any family problems or
12 marital problems at that time?
13   A.   No.
14   Q.   Had your spouse or anyone else given you
15 any pressure about the need to loose weight or the
16 need to change anything about your lifestyle?
17   A.   No.
18   Q.   Ms. Sanders, can you tell me what, if
19 anything, you remember about the phentermine that you
20 were prescribed by Dr. Henson and what it looked
21 like?
22   A.   I don't remember.
23   Q.   And do you recall any -- anything about the
24 dosage?
25   A.   No.

Page 192

1    Q.   Do you recall whether it was a capsule, a
2  tablet, or a pill?
3    A.   I don't remember.
4    Q.   And as I understand it, when you took the
5  diet drugs, you had a feeling of heart racing and
6  that sort of thing; is that correct?
7    A.   Yes.
8    Q.   Do you still have those symptoms today?
9    A.   Yes.
10   Q.   And you still associate those symptoms with
11 having taken diet drugs in 1999?
12   A.   I don't know.
13   Q.   Okay.  Do you remember any words or
14 markings on the diet drugs?
15   A.   No.
16   Q.   Other than the peach drug, you do not
17 recall what the other drugs -- what the color of the
18 other drug was; is that correct?
19   A.   Yes.
20   Q.   Have you ever had any communications with a
21 company called Goldline Pharmaceuticals?
22   A.   No.
23   Q.   Have you ever had any communications with a
24 company called Rugby Laboratories?
25   A.   No.

Page 193

1    Q.   Have either of those companies ever made
2  any representations to you about any drug?
3    A.   No.
4    Q.   And as I understand it, anything that you
5  would have had left over in the way of bottles or
6  pills, you turned over to somebody at a meeting; is
7  that correct?
8    A.   Yes.
9    Q.   And do you remember specifically having
10 done that?
11   A.   Yes.
12   Q.   Okay.  And do you remember if you turned
13 over a bottle or a pill, which of the two?
14   A.   I don't remember.
15       MS. WHITEHEAD:  Michelle, at this
16 time, to the extent that might be in the possession
17 of Page Kruger or Colom, I would request production
18 of it or an opportunity to inspect it.
19       MS. TOLLE:  Okay.  And I'm not sure
20 what we have, but I will -- when I get back to the
21 office, I will find out.
22       MS. WHITEHEAD:  Okay.  And having said
23 that and pending any further pharmacy records or
24 medical records, I have no further questions.
25       MS. TOLLE:  Okay.  Thank you.

Sanders, et al. v. Wyeth, et al.                    Deposition of                              April 16, 2004
                                                   Mary Sanders

Page 194

1           MS. WHITEHEAD:  Thank you, Ms.
2   Sanders.
3           THE WITNESS:  Thank you.
4           EXAMINATION
5   BY MS. LADNER:
6       Q.  Ms. Sanders, I'm Lynn Ladner.  I've got
7   just a couple of very quick questions.  I want to
8   clarify, did you ever receive any diet drug
9   medication prescriptions from any doctor other than
10  Dr. Henson?
11      A.  No.
12      Q.  Did you ever pick up any prescriptions for
13  diet drug medications from any pharmacy other than
14  the Wal-Mart in Mobile?
15      A.  No.
16      Q.  And have you ever had any communications
17  with SmithKline Beecham?
18          MS. TOLLE:  I just want to clarify.
19  On your last question, you asked about Wal-Mart.
20          MS. LADNER:  Yes, ma'am.
21          THE WITNESS:  I never went to
22  Wal-Mart.  It was Kmart.
23          MS. TOLLE:  Okay.  Could you say that
24  for the record?
25      A.  Oh.  I've never been to Wal-Mart.  It was

Page 195

1   Kmart.
2       Q.  (By Ms. Ladner)  Excuse me.  Thanks.  I
3   appreciate your paying attention to that.  So other
4   than the Kmart in Mobile, Alabama, you have not ever
5   received prescription medications for diet drugs from
6   any other pharmacy; is that correct?
7       A.  Yes.
8       Q.  That is correct?
9       A.  That's correct.
10      Q.  Okay.  And have you ever had any
11  communications with SmithKline Beecham?
12      A.  No.
13          MS. LADNER:  That's all I have at this
14  time.
15          MR. BROUILLETTE:  I have no questions.
16          MS. TOLLE:  Wow.
17          MR. BLOUNT:  I just want to say to
18  leave the deposition open until -- pending any
19  further proof of taking Pondimin and any further
20  medical records that may exist that proves she took
21  Pondimin.
22          MS. TOLLE:  Okay.  All right.  I have
23  no questions.
24          MR. FORD:  This concludes the
25  deposition of Mary F. Sanders, taken on April the

Page 196

1   16th, 2004.  The time is 1:36 p.m.  We're off the
2   record.
3           (Whereupon, the deposition was
4   concluded at 1:36 p.m.)

Page 197

1           CERTIFICATE OF COURT REPORTER
2       We, BOND & ASSOCIATES, Court Reporters in and
3   for the State of Mississippi, do hereby certify that
4   the above and foregoing pages contain a full, true
5   and correct transcript of the testimony of Marsha
6   Wright, taken in the aforementioned case at the time
7   and place indicated, which proceedings were recorded
8   by Regina D. Russell, C.S.R., to the best of their
9   skill and ability.
10      We also certify that the witness was placed
11  under oath to tell the truth and that all answers
12  were given under that oath.
13      We certify we have no interest, monetary or
14  otherwise, in the outcome of this case.
15
16      This the 23rd day of April, 2004.
17
18
19      _____
20              Bond & Associates
21
22
23
24
25

Sanders, et al. v. Wyeth, et al.                    Deposition of                              April 16, 2004
                                                    Mary Sanders

Page 198

1       IN THE UNITED STATES DISTRICT COURT
2       FOR THE EASTERN DIVISION OF PENNSYLVANIA
3
4    IN RE DIET DRUGS
     (PHENTERMINE/            MDL. NO. 1203
5    FENFLURAMINE/DEXFENFLURAMINE)
     PRODUCTS LIABILITY LITIGATION
6           * * * * * * * *
7    MARY SANDERS, ET AL.           PLAINTIFFS
8    V.              CIVIL ACTION NO. 2:03CV20121
9    WYETH-AYERST PHARMACEUTICALS, INC.,
     f/k/a WYETH-AYERST LABORATORIES, INC.;
10   ET AL.                     DEFENDANTS
11
12          CERTIFICATE
13
14       I, Mary Sanders, have read the foregoing
15   pages, 1-196, of the transcript of my deposition
16   given on April 16, 2004, and it is true, correct and
17   complete to the best of my knowledge, recollection
18   and belief except for the list of corrections, if
19   any, attached on a separate sheet herewith.  Witness
20   my hand, this the        day of
21   2004.                                    ,
22
23
            Mary Sanders
24
25

Page 199

1           CERTIFICATE
2
3       Subscribed and sworn to before me, this the
4       day of                , 2004.
5
6
            Notary Public in and for the
7           County of
     My Commission       State of Mississippi
8    Expires:
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 200

1               BOND & ASSOCIATES
                POST OFFICE BOX 320666
2             JACKSON, MISSISSIPPI  39232
                  (601) 936-4466
3
                  CORRECTION LIST
4
5    Mary Sanders, et al vs. Wyeth-Ayerst Pharmaceuticals,
     Inc., et al
6    No. 2:03CV20121
7    CAPTION
8    April 16, 2004        Mary Sanders
9    DATE OF DEPOSITION        DEPONENT'S NAME
10   PAGE LINE   CORRECTION         REASON
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25              Mary Sanders

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DIVISION OF PENNSYLVANIA
 2

 3    IN RE DIET DRUGS                    MDL NO. 1203
      (PHENTERMINE/)
 4    FENFLURAMINE/DEXFENFLURAMINE)
      PRODUCTS LIABILITY LITIGATION
 5

 6    BRENDA STALLINGS, ET AL.                PLAINTIFFS

 7    v.                       CIVIL ACTION NO. 2:02cv20118

 8    WYETH, ET AL.                            DEFENDANTS

 9


10
      ***************************************************
11         VIDEO DEPOSITION OF BRENDA M. STALLINGS
      ***************************************************
12

13

14              APPEARANCES NOTED HEREIN

15

16

17
                Taken at the instance of Wyeth
18       at Page Kruger & Holland, Jackson, Mississippi
                   Monday, June 28, 2004
19        beginning at approximately 10:06 a.m.

20

21

22
             KELLYE S. SHOWS, CSR  MS CSR #1290
23                    Bond & Associates
                   Post Office Box 320666
24              Jackson, Mississippi  39232
                     (601) 936-4466
25
```

Stallings, et al. v. Wyeth, et al.

Deposition of
Brenda Stallings

June 28, 2004

Page 2

A P P E A R A N C E S

MR. BRANDON I. DORSEY
Page, Kruger & Holland
10 Canebrake Boulevard
Jackson, Mississippi  39232
    COUNSEL FOR PLAINTIFF

MR. JOSHUA J. WIENER
Butler Snow O'Mara Stevens & Cannada
AmSouth Plaza, 17th Floor
Jackson, Mississippi  39201
    COUNSEL FOR WYETH

MR. KEN MANSFIELD
Wells Marble & Hurst
317 East Capitol Street
Jackson, Mississippi  39201
    COUNSEL FOR GATE PHARMACEUTICALS

MS. MOLLY WALKER
Watkins & Eager
400 East Capitol Street
Jackson, Mississippi  39201
    COUNSEL FOR SMITHKLINE BEACHAM

MS. KAARA LIND
Page Mannino Peresich & McDermott
1105 30th Avenue
Gulfport, Mississippi  39501
    COUNSEL FOR GOLDLINE LABORATORIES AND
    RUGBY LABORATORIES

ALSO PRESENT:  GARY RICHARDSON, VIDEOGRAPHER

Page 3

        BRENDA M. STALLINGS,
    having been first duly sworn, was
    examined and testified as follows:
        EXAMINATION
BY MR. WIENER:
    Q.   Would you state your full name, please.
    A.   Brenda M. Stallings.
    Q.   Ms. Stallings, my name is Josh Wiener.
I'm a lawyer in Jackson, Mississippi; and I
represent a company named Wyeth.  I'm going to be --
I'm going to be taking your deposition this morning
which amounts to my asking you questions about the
claim that you have submitted pertaining to your
taking of diet drugs.  Do you understand that?
    A.   Yes, sir.
    Q.   All right.  And let me tell you that if I
ask you any question in a way that is unclear to you
and you're not sure what I'm asking or you need for
me to rephrase my question or clarify what I'm
asking, please let me know and I'll be happy to do
so.  Okay?
    A.   Okay.
    Q.   And if you go ahead and answer my
question and you don't ask me to clarify it or
rephrase it I'm going to assume that you understood

Page 4

it when you answered it.  Okay?
    A.   Okay.
    Q.   And, Ms. Stallings, you understand that
you have been sworn to tell the truth here this
morning by the court reporter?
    A.   Yes.
    Q.   And you understand that your testimony
here this morning -- even though we're not in a
courtroom, you understand that you're giving
testimony under oath in your case that you have
filed?
    A.   Yes.
    Q.   All right.  And you understand that you
are subject to the penalty of perjury in the event
any of your testimony would be deemed to be untrue?
    A.   Okay.  Yes.
    Q.   All right.  Let me also tell you,
Ms. Stallings, we're going to be here awhile.  It's
going to take awhile to get through all of the
information that I need to cover with you.  So if at
any time you need to take a break please let me know
and I'll be happy to accommodate you, and we'll take
a break and give you a chance to get a drink of
water or rest or whatever.
    A.   Okay.

Page 5

    Q.   And I probably will need to take a break
myself along the way.
    A.   Okay.
    Q.   All right.
        MR. WIENER:  First of all, I'd like to
mark as the first deposition exhibit the Notice of
Depositions that includes the taking of this
deposition.  It was originally scheduled for May 27,
2004.  And, Brandon, it's my understanding that it
was postponed and rescheduled for this date with
agreement of all counsel?
        MR. DORSEY:  Yes, that's correct.
        MR. WIENER:  Let me get that marked as
Exhibit 1, please.  Let me show it to Brandon
first.
        (EXHIBIT NO. 1 MARKED.)
MR. WIENER:
    Q.   And, Ms. Stallings, I'm going to show you
what I believe is the fact sheet that you prepared
and which was filed in MDL No. 1203.  I'm going to
show it to your attorney first and then have him
hand it to you.  Thank you.  Okay.  All right.
        Ms. Stallings, if you'll take a look at
that, I'd like you to look through each page and
familiarize yourself with that document.

2 (Pages 2 to 5)

Stallings, et al. v. Wyeth, et al.

Deposition of
Brenda Stallings

June 28, 2004

Page 6

1    A.    (Reviewed document.)  Am I taking too
2   long?
3    Q.    No, that's fine.  All right.
4   Ms. Stallings, have you had an opportunity to look
5   through each page of the document that I just handed
6   to you?
7    A.    Yes.
8    Q.    And do you recognize that as a
9   Plaintiff's Fact Sheet that you completed in
10  connection with your pursuit of a claim that's
11  connected with your taking of diet drugs?
12   A.    Yes.
13   Q.    All right.  Is the handwriting on that
14  form your own handwriting?
15   A.    Yes.
16   Q.    Did anyone assist you in completing that
17  form?
18   A.    No.
19   Q.    And after you completed the form, who did
20  you send it to?
21   A.    Here, Page, Kruger & Holland.
22   Q.    All right.
23        MR. WIENER:  With that, let me get
24  Ms. Stallings' fact sheet marked as Exhibit No. 2,
25  please.

Page 7

1        (EXHIBIT NO. 2 MARKED.)
2   MR. WIENER:
3    Q.    Ms. Stallings, at the time that you
4   completed this fact sheet were you satisfied that
5   the information that you had put on the fact sheet
6   was true and accurate to the best of your knowledge
7   and belief?
8    A.    Yes, to the best of my knowledge.
9    Q.    All right.  And does that appear to be a
10  complete and accurate copy of the fact sheet that
11  you submitted on that occasion?
12   A.    Yes, sir.
13        MR. WIENER:  Brandon, I neglected to
14  cover with you preliminaries before we began the
15  taking of the deposition.  Of course, the deposition
16  is being taken pursuant to the Federal Rules of
17  Civil Procedure.  Can we have an agreement that all
18  objections will be reserved except as to the form of
19  the question?
20        MR. DORSEY:  Yes.
21        MR. WIENER:  And also, Brandon, I
22  mentioned that I represented Wyeth, and, of course,
23  that company was previously known as American Home
24  Products.  I would also be representing any Wyeth
25  entities that may have been named in the Complaint.

Page 8

1        MR. DORSEY:  That's fine.
2   MR. WIENER:
3    Q.    Ms. Stallings, have you ever given a
4   deposition before?
5    A.    Yes.
6    Q.    All right.  What -- do you remember what
7   case your deposition was taken in?
8    A.    It was a discrimination lawsuit.
9    Q.    All right.  And were you the plaintiff in
10  that case?
11   A.    Yes.
12   Q.    Were there any other plaintiffs?
13   A.    No.
14   Q.    Do you remember who you were suing at
15  that time?
16   A.    Macon Police Department.
17   Q.    When -- when was that suit filed?
18   A.    I'm not sure on dates.
19   Q.    Can you give me a rough estimate.  I
20  won't hold you to it, but....
21   A.    I believe it was in '93.  I'm not
22  certain.
23   Q.    But it's been --
24   A.    It's been a while.
25   Q.    -- a long time ago?

Page 9

1    A.    Yes, it has.
2    Q.    Was the case filed in Federal Court to
3   the best of your knowledge?
4    A.    It never made it to court.
5    Q.    I see.  Did you bring a claim at the EEOC
6   against --
7    A.    Yes.
8    Q.    -- the Macon Police Department?
9    A.    Yes.
10   Q.    What office of the EEOC did you use in
11  making your complaint?
12   A.    I think it was the discrimination
13  office.  I'm not sure.
14   Q.    I'm asking you where was the EEOC office
15  where you filed your complaint.  I know there's one
16  here in Jackson, but it's possible that you
17  submitted it somewhere else.
18   A.    It was Jackson.
19   Q.    It was in Jackson?
20   A.    Yes, it was.
21   Q.    And the responding party was the Macon
22  Police Department?
23   A.    Yes.
24   Q.    Were you an employee of the Macon Police
25  Department?

Stallings, et al. v. Wyeth, et al.                Deposition of                    June 28, 2004
                                               Brenda Stallings

Page 10

1    A.    No.
2    Q.    All right.  Give me a summary of what
3    your claim was about.
4    A.    They didn't hire women.  They had a
5    problem with hiring women.  They had all men.  And I
6    had filled out an application for a job and got
7    denied.  I didn't even get an interview.
8    Q.    I see.
9    A.    I filed a claim.
10   Q.    So your claim was discrimination based on
11   gender --
12   A.    Uh-huh.
13   Q.    -- based on the Macon Police Department
14   not hiring you when you applied?
15   A.    Right.  Yes.
16   Q.    And did you have an attorney in making
17   that claim?
18   A.    Yes.
19   Q.    Who was your attorney?
20   A.    William Bambach.
21   Q.    Okay.  And what was the outcome of your
22   claim against the Macon Police Department?
23   A.    It wasn't enough evidence to prove that
24   it was discrimination.
25   Q.    Okay.  Did the EEOC dismiss your charge

Page 11

1    or make a finding that there was no cause to support
2    your charge?
3    A.    Yes.  Yes.
4    Q.    You remember that the EEOC basically
5    turned you down on that?
6    A.    Yes.
7    Q.    And did you pursue any appeal or do
8    anything further after the EEOC denied your claim?
9    A.    No.
10   Q.    You didn't receive any type of settlement
11   or money from the Macon Police Department?
12   A.    No.
13   Q.    Now, I believe you told me you had had
14   your deposition taken before and that it was in that
15   case.
16   A.    Uh-huh.
17   Q.    Is that correct?
18   A.    Yes.
19   Q.    So you actually gave sworn testimony?
20   A.    Yes.
21   Q.    And to the best of your knowledge, was
22   that sworn testimony given within the confines of
23   the EEOC charge?  In other words, what I'm asking
24   you is, did you have a -- did you have a claim on
25   file with EEOC and it was while that claim was

Page 12

1    pending that you gave a deposition?
2    A.    Let me see can I answer that.
3    Q.    Okay.
4    A.    I don't remember how that actually went.
5    I don't really recall the procedures totally.  I
6    don't know.
7    Q.    Do you still have a file about that claim
8    at your home?
9    A.    No, I don't.
10   Q.    Did you give sworn testimony in a format
11   that's similar to what we have today?  In other
12   words, was there a court reporter present who was
13   typing down what you said?
14   A.    Yes.
15   Q.    All right.  And your attorney Mr.
16   Bombock --
17   A.    Bambach.
18   Q.    -- Bambach, he was there with you when
19   your testimony was taken?
20   A.    Yes.
21   Q.    And do you remember the lawyer that asked
22   you the questions?
23   A.    No, sir.
24   Q.    He was representing the Macon Police
25   Department?

Page 13

1    A.    Yes, sir.
2    Q.    I have seen on various documents the name
3    Brenda M. Stallings.  Is that correct?
4    A.    Uh-huh.
5    Q.    What does the "M" stand for?
6    A.    Macon.
7    Q.    All right.  And before you were Brenda
8    Stallings, did you have another name?
9    A.    I was Brenda Cunningham.
10   Q.    And when did you become Brenda Stallings
11   and why did your name change at that time?
12   A.    I remarried, and it was in '96 -- 1996.
13   Q.    All right.  And what was your name at
14   birth?
15   A.    Brenda Lee Macon.
16   Q.    Brenda Lee Macon?
17   A.    Uh-huh.
18   Q.    All right.  And then was Cunningham a
19   married name?
20   A.    Yes.
21   Q.    All right.  When did you marry
22   Mr. Cunningham?
23   A.    In 1989.
24   Q.    And how did -- your marriage to him
25   terminated?

Page 14

1   A.   Yes.
2   Q.   And was it by divorce?
3   A.   Yes, divorce.
4   Q.   When did you and Mr. Cunningham become
5   divorced?
6   A.   1992.
7   Q.   And do you remember where the divorce was
8   handled -- what court it was handled in?
9   A.   No, I don't.
10  Q.   Did you have an attorney on that
11  occasion?
12  A.   That was William Bambach also who did it.
13  Q.   Where were you living at the time of that
14  divorce?
15  A.   In Macon.
16  Q.   All right. So do you think it might have
17  been handled at the Noxubee County Chancery Court?
18  A.   We didn't go to court.
19  Q.   Okay. And then you say you married in
20  1996 and became Brenda Stallings.
21  A.   Yes.
22  Q.   All right. And are you still married to
23  Mr. Stallings?
24  A.   Yes.
25  Q.   What does he do for a living?

Page 15

1   A.   He works at a chemical plant. I don't
2   know exactly what his job title is.
3   Q.   All right. What's the name of the
4   chemical plant?
5   A.   Kerr Magee Chemicals.
6   Q.   Where is that located?
7   A.   In Hamilton, Mississippi.
8   Q.   And has Mr. Stallings been doing -- been
9   working for that company since you married in 1996?
10  A.   Yes.
11  Q.   All right. Have the two of you continued
12  to reside together continuously since your marriage?
13  A.   On and off. On and off.
14  Q.   On and off?
15  A.   Yes.
16  Q.   There have been periods of time that you
17  all have been separated?
18  A.   Yes.
19  Q.   Can you tell me -- give me a best
20  judgment or best estimate of when -- of the periods
21  that you've been separated from each other?
22  A.   Just last year. It didn't last but about
23  two months last year. I don't know what month. And
24  about two years before then --
25  Q.   Okay.

Page 16

1   A.   -- we were separated for about six months.
2   Q.   All right. So you had two periods during
3   your marriage of being separated?
4   A.   Yes.
5   Q.   And are the two of you reconciled now?
6   A.   Yes.
7   Q.   Have you had any children with
8   Mr. Stallings?
9   A.   No.
10  Q.   Did you have any children with
11  Mr. Cunningham?
12  A.   Yes.
13  Q.   If you would, tell me the names and ages
14  of the children that you had with Mr. Cunningham.
15  A.   Okay. My daughter Shereka is 19, my son
16  Christopher is 18, and my son Demarcus who is 14.
17  Q.   And all three of those are children that
18  you had with Mr. Cunningham?
19  A.   Yes, sir.
20  Q.   What's Mr. Cunningham's first name?
21  A.   Larry.
22  Q.   And where does he live?
23  A.   In Columbus, Mississippi.
24  Q.   Does he continue to have a relationship
25  with his children?

Page 17

1   A.   No.
2   Q.   Do you ever see him?
3   A.   Occasionally. Not a lot.
4   Q.   And where do your three children reside
5   at the current time?
6   A.   They live with me.
7   Q.   And have each of them completed school or
8   are they in school?
9   A.   Shereka is in college and Christopher --
10  both the other two are still in school.
11  Q.   Seniors?
12  A.   Christopher is a senior this year and
13  Demarcus is going to the ninth grade.
14  Q.   All right. Thank you. Have you had any
15  other marriages other than to Mr. Cunningham and
16  Mr. Stallings?
17  A.   No, sir.
18  Q.   And have you had any other children than
19  the three children that you've talked about?
20  A.   No, sir.
21  Q.   Where were you born, Ms. Stallings?
22  A.   Noxubee County.
23  Q.   And your date of birth is?
24  A.   February 17, 1966.
25  Q.   And what is your Social Security number?

Stallings, et al. v. Wyeth, et al.                 Deposition of                          June 28, 2004
                                             Brenda Stallings

Page 18

1    A.    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.
2    Q.    I'm sorry.  Say that again, please.
3    A.    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.
4    Q.    Okay.  Thank you.  And you live in Macon
5  at the present time?
6    A.    Yes, sir.
7    Q.    Do you live in an apartment or a house?
8    A.    A house.
9    Q.    Okay.  Is it a single family residence?
10    A.    What do you mean by that?
11    Q.    Well, I'm asking is there any other
12  family?  Is there another part to the house?
13    A.    Oh, single family, yes.
14    Q.    Yes.  I meant as opposed to a duplex or
15  something like that.  And do you own that home?
16    A.    Yes, along with Jerry.
17    Q.    You and your husband, Mr. Stallings?
18    A.    Uh-huh.
19    Q.    How long have you owned that home?
20    A.    Seven years.
21    Q.    And do your three children and
22  Mr. Stallings all live together in that home?
23    A.    Yes, sir.
24    Q.    Anybody else?
25    A.    That's it.

Page 19

1    Q.    Is it a one-story home or --
2    A.    One story.
3    Q.    And do you know approximately how large
4  it is?
5    A.    No.  Just three bedrooms and two baths is
6  all I can tell you.
7    Q.    All right.  Thank you.  Have you ever
8  lived outside of Macon County?
9    A.    No.
10    Q.    So you were born and raised there and
11  live there today.  It's where you've lived your
12  whole life?
13    A.    Yes.
14    Q.    Are you currently employed, Ms. Stallings?
15    A.    I'm self-employed.
16    Q.    All right.  And what's your line of work?
17    A.    Hairstylist.
18    Q.    Hairstylist?
19    A.    Uh-huh.
20    Q.    And where is your place of business?
21    A.    It's in Macon, Mississippi.
22    Q.    Is it in -- it's not at your home, is it?
23    A.    No.  It's like a mile from my house.
24    Q.    Is it close to the downtown area?
25    A.    Yes, sir.

Page 20

1    Q.    Or is it in downtown Macon?
2    A.    The town is so small -- it's in downtown,
3  yes.
4    Q.    And do you operate your own hairstyling
5  business?
6    A.    Yes, sir.
7    Q.    What's the name of it?
8    A.    Brenda's Cutting Edge.
9    Q.    How long have you been operating that
10  business?
11    A.    Five years.
12    Q.    Does anybody else work in the business
13  with you?
14    A.    No, sir.
15    Q.    So on any given day if I walked into your
16  place of business I would find you and you alone
17  working there?
18    A.    Not on any given day.  I only work on
19  Wednesday through Saturday.  So any day in between
20  there it's just me.
21    Q.    All right.  Have you ever had people
22  working with you, other hairstylists?
23    A.    I rented a booth out once, but -- about
24  six months.
25    Q.    Okay.  That didn't work out?

Page 21

1    A.    That didn't work out.
2    Q.    And you told me that your usual schedule
3  is Wednesday to Saturday?
4    A.    Uh-huh.
5    Q.    What are your hours of operation during
6  those days?
7    A.    Nine to 5:30.
8    Q.    What did you do before you started
9  operating your hairstyling place?
10    A.    I drove a school bus for Noxubee County
11  School System and worked at the Junior Food Mart.
12  And what else did I do.  Angie's Restaurant.
13    Q.    All right.  Let's see if we can put some
14  dates -- and I understand you may be just giving me
15  an estimate or you may tell me you're just not able
16  to do it.  But do your best and let's see if we can
17  figure out what dates you engaged in these different
18  employments.  You've told me that you operated your
19  current hairstyling business for approximately five
20  years?
21    A.    Uh-huh.
22    Q.    All right.  And so would that mean that
23  you started sometime in approximately 1999?
24    A.    Well, that was my own business five years
25  ago, but I did have previously at another salon I

Stallings, et al. v. Wyeth, et al.    Deposition of    June 28, 2004
Brenda Stallings

Page 22

1  just rented a booth. That was from -- oh, God,
2  these dates are going to be way out there. '92 to
3  '96, I believe, or '97.
4    Q.  All right. And that's when you started
5  your own business?
6    A.  I started my own business in '99.
7    Q.  Okay.
8    A.  So any dates -- between from '92 in
9  between that's where I was because I left one shop
10  and went immediately into my own. So the dates in
11  between there.
12    Q.  So you were a hairstylist in someone
13  else's place of business. You had a booth in
14  someone else's place of business from approximately
15  1992 until you started your own business in
16  approximately 1999?
17    A.  Yes.
18    Q.  Where was the place that you worked
19  from '92? And I know you're using that as an
20  approximate date.
21    A.  Uh-huh.
22    Q.  Where was the place that you worked
23  from '92 to '99?
24    A.  It's in Macon also.
25    Q.  What's the name of it?

Page 23

1    A.  It was JJ Beauty Salon.
2    Q.  And who was the owner of that?
3    A.  Katherine Johnson.
4    Q.  And did Ms. Johnson also work at the
5  beauty salon?
6    A.  No.
7    Q.  She just owned it and other people came
8  in and had booths there?
9    A.  Uh-huh.
10    Q.  Did you have to pay her rent or what was
11  the arrangement that you had?
12    A.  Yes, I just paid rent.
13    Q.  Do you remember names of other
14  hairstylists that worked with you at that time?
15    A.  Oh, when I started it was just Mary
16  Sanders when I started there.
17    Q.  And where is Ms. Sanders from?
18    A.  She's from Macon.
19    Q.  All right. And can you give me the names
20  of other people that worked with you or that worked
21  in that same place?
22    A.  It was just me and her for a while at
23  that time.
24    Q.  All right.
25    A.  Just two at a time.

Page 24

1    Q.  And I hear you're telling me that she was
2  the only one there for a while, but that's
3  suggesting that maybe someone else came and worked
4  there at some point.
5    A.  Not while I was there.
6    Q.  Okay.
7    A.  Maybe I phrased it wrong.
8    Q.  I got you. All right.
9    A.  It was just me and her during that time.
10    Q.  Well, good. That's what I want you to do
11  is listen carefully to me to my questions.
12    A.  Okay.
13    Q.  And it sounds like you're doing that.
14  All right. And before working at the place owned by
15  Ms. Johnson in approximately 1992, you worked where?
16    A.  Mayfair Apartments. I worked there seven
17  years.
18    Q.  What did you do for them?
19    A.  I was a resident manager.
20    Q.  All right. And where are the Mayfair
21  Apartments located?
22    A.  It's in Macon.
23    Q.  Who was the person that you worked for
24  when you worked for Mayfair Apartments?
25    A.  Hughes Management.

Page 25

1    Q.  Okay. That was the company that managed
2  the apartment complex?
3    A.  Yes.
4    Q.  And was there a particular person at
5  Hughes Management that you reported to?
6    A.  Oh, yes. Matthew Turner.
7    Q.  Where was he located?
8    A.  He was located in Louisville.
9    Q.  Lucedale?
10    A.  Louisville.
11    Q.  Oh, I'm sorry. Louisville, Mississippi?
12    A.  Uh-huh.
13    Q.  What was the reason for your leaving the
14  employment of Hughes Management and Mayfair
15  Apartments?
16    A.  I just got tired of it.
17    Q.  So you voluntarily resigned?
18    A.  Yes.
19    Q.  And went from there to working as the
20  hairstylist?
21    A.  Uh-huh.
22    Q.  What did you do before you worked for the
23  Hughes Management?
24    A.  I was a bus driver.
25    Q.  For Macon Schools?

Stallings, et al. v. Wyeth, et al.　　　　　Deposition of　　　　　June 28, 2004
Brenda Stallings

Page 26

1　　A.　Uh-huh.
2　　Q.　And did that -- well, let's -- I was
3　trying to establish dates. So let's see if we can
4　do this. You worked for Mayfair and Hughes
5　Management approximately seven years?
6　　A.　Uh-huh.
7　　Q.　So does that take us back to about 1985?
8　　A.　Uh-huh.
9　　Q.　And then you -- before that you were
10　working as a bus driver for the Macon County
11　Schools?
12　　A.　Right. I think I went too far back when
13　I said '85. That's the year I graduated. These
14　dates are going to mess me up. I started working
15　for the Noxubee County School System in 1987 and I
16　started working for Mayfair Apartments also in
17　1987. I worked both jobs.
18　　Q.　I see.
19　　A.　Yes.
20　　Q.　Okay.
21　　A.　And --
22　　Q.　Go ahead.
23　　A.　And Junior Food Mart. Add that in in
24　1988.
25　　Q.　So were you working at all three places

Page 27

1　for some period of time?
2　　A.　Yes.
3　　Q.　Noxubee County Schools as a bus driver.
4　　A.　Uh-huh. Junior Food Mart.
5　　Q.　The Junior Food Mart which is located
6　where?
7　　A.　In Macon.
8　　Q.　In Macon. And also for the management
9　company?
10　　A.　Yes.
11　　　　MR. WIENER: I tell you what I'd like to
12　do is take about a two-minute break. I've got
13　10:36. Why don't we -- has everybody got that as
14　their time? I may be wrong. I've got about 10:37.
15　And why don't we come back at about 10:40. Is that
16　okay with everybody?
17　　　　MR. DORSEY: That's fine.
18　　　　(OFF THE RECORD.)
19　MR. WIENER:
20　　Q.　Ms. Stallings, before we broke I was
21　asking you about your employment history, and I
22　think you were telling me that back in approximately
23　1985 that that time period you were working for
24　three employers simultaneously: Junior Food Mart,
25　Hughes Management, and Noxubee County Schools. Is

Page 28

1　that correct?
2　　A.　Uh-huh. Yes.
3　　Q.　And how long did you drive a bus for
4　Noxubee County Schools?
5　　A.　Three years.
6　　Q.　Three years?
7　　A.　Uh-huh.
8　　Q.　And what was the -- who was -- I'm sorry.
9　Who was the person that you worked for at the
10　Noxubee County Schools?
11　　A.　Who was the person? You want to know who
12　the supervisor was?
13　　Q.　Yes.
14　　A.　Is that what you're asking? Okay.
15　Charlie Conner.
16　　Q.　Charlie Conner?
17　　A.　Uh-huh.
18　　Q.　And did you run a route in the morning
19　and then again in the afternoon?
20　　A.　Uh-huh.
21　　Q.　What was the reason for your stopping
22　work for Noxubee County Schools?
23　　A.　It was beginning to interfere with my
24　hours at the other job.
25　　Q.　Okay. And which job was it interfering

Page 29

1　with?
2　　A.　Mayfair.
3　　Q.　I see. And so you voluntarily resigned
4　from the Noxubee County Schools?
5　　A.　Yes, sir.
6　　Q.　And just -- let's just be sure of this if
7　we can. What years were you driving for them?
8　　A.　'87. '87.
9　　Q.　'87 to '90 approximately?
10　　A.　Yes.
11　　Q.　Okay. And the Junior Food Mart located
12　in Macon?
13　　A.　Uh-huh.
14　　Q.　What kind of work did you do for them?
15　　A.　Just cashier.
16　　Q.　Cashier?
17　　A.　Uh-huh.
18　　Q.　And how long did you work for Junior Food
19　Mart?
20　　A.　About a year and a half.
21　　Q.　Who was your supervisor there?
22　　A.　I don't remember who the supervisor was.
23　They went through so many I can't remember who it
24　was at the time.
25　　Q.　And what was the reason for your stopping